**NOVA UNIVERSITY, Petitioner,**

v.

**EDUCATIONAL INSTITUTION LICENSURE COMMISSION,**
**Respondent.**

**No. 83–234.**

District of Columbia Court of Appeals.

Argued March 6, 1984.

Decided Nov. 9, 1984.

Hershel Shanks, Washington, D.C., for petitioner. Steven A. Standiford, Washington, D.C., also entered an appearance.

Lutz Alexander Prager, Asst. Corp. Counsel, Washington, D.C., with whom Judith W. Rogers, Corp. Counsel, Washington, D.C., at the time the brief was filed, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief, for respondent.

Before MACK and NEWMAN, Associate Judges, and GALLAGHER, Associate Judge, Retired.

NEWMAN, Associate Judge:

Nova University (Nova) seeks review of an Order of the Educational Institution Licensure Commission (Commission) denying Nova's application for a license to offer Doctorate of Public Administration degree courses in the District of Columbia. The Commission denied the license, without prejudice, on the grounds that Nova had not complied with the District's licensing statutes and regulations with respect to adequate full-time faculty and adequate library resources.

Nova challenges the denial of its application for a license on the grounds that: (1) D.C.Code § 29–815 (1981), the District's licensing statute, is not applicable to schools, such as Nova, whose degrees are conferred outside the District of Columbia; (2) D.C. Code § 29–815 is unconstitutional on its face and as applied to Nova because it violates the First Amendment; (3) D.C. Code § 29–815 and the regulations guiding the issuance of licenses are unconstitutionally vague; and (4) the Commission's denial of a license was arbitrary, capricious, and unsupported by substantial evidence in the record.

We disagree with each of Nova's contentions, and therefore affirm the Commission's decision.

## I.

A preliminary review of the legislation relevant to this case and its history is helpful to place in context the issues raised by Nova. In 1929, the District of Columbia was not only the capital of the United States, but the "capital" for practically all diploma mills operating not only in the District, but throughout the United States and the world. S.REP.No. 611, 70th Cong., 1st Sess. (1928). This dubious distinction resulted from the District's lax laws relating to the incorporation of educational institutions, the power these institutions had to confer degrees under their general charters, and the opportunity to advertise themselves as operating under the authority of the United States Government or Congress.

*Id.* at 2. Hundreds of fraudulent institutions of "learning" incorporated in the District and sold degrees from baccalaureate to doctoral in every conceivable field of study with little or no academic work; in addition, the charters themselves were sold to individuals who carried on the "educational" programs in other states and countries. *Id.* at 2. At the urging of the United States Attorney's Office, local citizens and schools, sister jurisdictions and foreign countries, Congress enacted a statute "to Regulate Degree-Conferring Institutions in the District of Columbia." Pub.L.No. 70–949, § 586a, 45 Stat. 1504 (1929) (codified at D.C. Code §§ 29–815 to 818 (1981)). The statute requires licensing of all degree-conferring institutions incorporated in the District or incorporated in another state but operating in the District, and is set out in relevant part below:

§ 29–815. License to confer degrees— Issuance by Educational Institution Licensure Commission required.

No institution ... incorporated under the provisions of this chapter shall have the power to confer any degree in the District of Columbia or elsewhere, nor shall any institution incorporated outside of the District of Columbia ..., undertaking to confer any degree, operate in the District of Columbia, unless ..., by virtue of a license from the Educational Institution Licensure Commission, which before granting any such license may require satisfactory evidence:

(1) That in the case of ... an incorporated institution, a majority of the trustees, directors, or managers of said institution are persons of good repute and qualified to conduct an institution of learning;

(2) That any such degree shall be awarded only after such quantity and quality of work shall have been completed as are usually required by reputable institutions awarding the same degree ...,

. . . . .

(4) That considering the number and character of the courses offered, the faculty is of reasonable number and properly qualified, and that the institution is possessed of suitable classroom, laboratory, and library equipment.

D.C.Code § 29-815 (1981).

The statute provides for criminal penalties against anyone "who shall, directly or indirectly, participate in, aid, or assist in the conferring of any degree by any unlicensed ... institution .... D.C.Code § 29-819 (1981).

In 1977, the Council of the District of Columbia established the Educational Institution Licensure Commission to perform licensing functions under D.C.Code § 29-815. *See* D.C.Code § 31-1601 to 1608 (1981). The purpose of this legislation is outlined in its opening section and set out, in part, below:

> [T]o provide for the protection, education, and welfare of the citizens of the District of Columbia, its private educational institutions, and its students, by:
>
> (1) Establishing minimum standards concerning quality of education, ethical and business practices, health and safety, and fiscal responsibility to protect against substandard, transient, unethical, deceptive, or fraudulent institutions and practices;
>
> (2) Prohibiting the granting of false or misleading educational credentials;
>
> (3) Regulating the use of academic terminology in naming or otherwise designating educational institutions;
>
> (4) Prohibiting misleading literature, advertising, solicitation, or misrepresentation by educational institutions or their agents.

D.C.Code § 31-1601 (1981).

In 1980, the Council amended the 1977 statute, giving legislative sanction to regulations previously promulgated by the Commission's predecessor, the Board of Higher Education. D.C.Code § 31-1606(a) (1981). These regulations set forth the procedures and criteria by which licenses are issued and revoked. *See* Regulations Relating to the Licensing of Institutions Which Confer Degrees (1978) [hereinafter Regulations].

Section III of the Regulations contains eleven criteria the Commission is to consider in issuing licenses, involving inquiry into: institutional control; administrative staff and procedures; financial resources; number and quality of faculty; curricula, correspondence, extension, and summer session programs; admission requirements; library; physical plant and equipment; student personnel, health, and recreational services; and institutional publications. Applicants for a license are required to submit a statement as to how they plan to meet the criteria or give reasons why they consider themselves justified in not meeting a particular requirement. Regulations at § III (1)–(11). The regulations provide for flexibility, recognizing that "the ... criteria will not be equally applicable to each institution wishing to award degrees." *Id.* Applicants are entitled to a *de novo* hearing prior to the denial of a license, and to judicial review if a license is denied. *Id.* at § IV(e), (4)(2).[1]

## II.

It is against this statutory background that this case arose. Nova University is a non-profit corporation organized and existing under the laws of Florida. In addition to undergraduate, graduate, and professional curricula taught at its home campus in Fort Lauderdale, Nova has instituted a variety of field-based, or external degree programs, designed to lead to the conferral by Nova in Florida of various degrees for professional persons. The field-based program of concern here is the Doctorate of Public Administration (DPA). Candidates for this degree are not required to fulfill traditional residence requirements at the

---

**1.** Section IV of the Commission's Regulations regarding the applicant's right to a hearing and appeal parallel the District of Columbia Administrative Procedure Act, D.C.Code §§ 1-1509, -1510 (1981 & 1984 Supp.).

Nova campus in Fort Lauderdale. Instead, they form "clusters" of 20 to 25 students who meet at a site in the areas where they live. At the time of the hearing, Nova was operating 11 clusters at various locations throughout the United States, with plans to increase to 15 in the near future.

Nova's DPA program requires a minimum of three years to complete and consists of nine sequences (analogous to semesters or quarters), with each sequence consisting of three to four "units" (analogous to courses). Six of the nine sequences are taught at the cluster sites, and each of the units meets once a month for approximately eighteen to twenty hours from Friday night through Saturday. The remaining three sequences are taught in residence in Ft. Lauderdale. Each of these last about one week and occur annually.

The faculty of the DPA program consists of approximately nine professors from Nova's Florida campus and thirty-three national members, called preceptors. Generally, preceptors travel to the clusters to teach local course units and the Florida-based faculty teaches Florida units. Preceptors are academicians and practitioners in the public administration field, most of whom also teach at universities with traditional residence requirements. In addition, each cluster is coordinated by a cluster director, a contract employee living in the cluster area whose role consists of administrative and recruitment duties as well as counseling students.

In addition to preparing papers in anticipation of the unit sessions, students must complete a series of research papers, pass comprehensive written and oral examinations, and complete a final paper, an "analytical research project," which Nova deems to be the equivalent of a doctoral dissertation. The research papers are supervised by Nova's faculty in Ft. Lauderdale, during the annual week long conferences, as well as by telephone and written communication. The two-day comprehensive written examination is prepared and graded by the faculty in Florida, but ad-ministered locally. The oral examination is taken in Florida and administered by faculty members. If a student successfully completes the course work, comprehensive oral and written tests, and analytical research project, Nova awards a Doctor of Public Administration, under powers derived from its incorporation in Florida.

Since 1971, Nova has been accredited by the Southern Association of Colleges and Schools (SACS), the officially recognized regional accrediting association of the southeastern United States. Nova's accreditation was most recently affirmed for a ten-year period after a review in 1974–75 of its educational programs, including its external degree programs, such as the one here at issue. In 1980, SACS separately reviewed Nova's field-based programs, including the DPA program, and this review had no effect on Nova's accreditation.

In October 1980, Nova applied to the Commission for a license to offer DPA degree courses in the District of Columbia. In response to Nova's application, the Commission appointed a three-person evaluation team, composed of non-members of the Commission and approved by Nova, to visit Nova in Florida to determine whether Nova's DPA program met the District's statutory and regulatory criteria for licensing.

The team issued a report recommending denial of a license. Nova responded to the team report, pointing out what it believed were factual errors, and providing the Commission with additional information and proposals. The Commission then appointed a Task Force, made up of two Commission members, to evaluate the team's report and Nova's response. On March 4, 1981, the Task Force submitted its findings and concluded that the Commission should deny licensure. The Commission approved the recommendations of the site evaluation team and notified Nova of its intention to deny a license, the reasons for this intent, and Nova's right to request a hearing.

A *de novo* hearing was held before the Commission on August 19, 23, and 24, 1982. On January 19, the Commission rendered its decision denying Nova's license application, concluding that Nova failed to demonstrate that it would have adequate full-time faculty or adequate library resources in the District of Columbia as required by D.C. Code § 29–815(4) and the Regulations § IV(e). Although the Commission denied the license, it did so without prejudice to Nova renewing its application, and offered to explain to Nova how it could meet the faculty and library requirements.

### III.

As a preliminary matter, we must address Nova's contention that this court can and should avoid the constitutional questions raised in this case by interpreting D.C.Code § 29–815 as excluding Nova from the licensing requirement. Section 29–815 requires "any institution incorporated outside of the District of Columbia ... undertaking to confer any degree, operate in the District of Columbia ..." unless it obtains a license from the Commission. Nova suggests that we interpret the statute as reading "undertak[es] to confer any degree *in the District of Columbia.*" Such a reading would exclude Nova from the license requirement because Nova confers its degree in Florida.

█ In urging this statutory interpretation, Nova reminds us of the well-established rule of statutory construction—a court "will not pass on the constitutionality of an [a]ct ... if a construction of the statute is fairly possible by which the question may be avoided." *United States v. Clark,* 445 U.S. 23, 27, 100 S.Ct. 895, 899, 63 L.Ed.2d 171 (1980). *Accord, District of Columbia v. Edgcomb,* 305 A.2d 506, 510 (D.C.1973); *see generally* 2A C. SANDS & SUTHERLAND, STATUTES AND STATUTORY CON-

STRUCTION § 45.11 (4th ed. 1973 & 1984 Supp.). The operative words of this axiom, however, are *fairly possible,* for a court cannot avoid constitutional questions by interpreting a statute in a way that is unreasonable in light of the language, purpose, and history of the legislation. *See, e.g., Edward J. DeBartolo Corp. v. NLRB,* 463 U.S. 147, 103 S.Ct. 2926, 2933 & n. 10, 77 L.Ed.2d 535 (1983).

█ Examining the language of § 29–815 we note the quite obvious fact that the statute does not contain the words Nova urges us to insert. Rather, the statute plainly requires degree conferring institutions incorporated outside the District to obtain a license to *operate* in the District without regard to where the degree is conferred.[2] "Operating" is defined as "maintain[ing] any facility or location in the District ... through which education is offered or given, or educational credentials are offered or granted, and includes contracting with any person, group, or entity, to perform any such act." D.C.Code § 31–1602(11) (1981). Given this definition and the fact that no words in the statute limit the licensing requirement to schools conferring degrees *in the District,* this plain language alone is sufficient for this court to reject Nova's argument. We have stated on numerous occasions that when the language of a statute is clear and admits of no more than one meaning, we are not empowered to look beyond the literal words of the statute. *See, e.g., Davis v. United States,* 397 A.2d 951, 956 (D.C. 1979); *United States v. Stokes,* 365 A.2d 615, 618 (D.C.1976); *Harrison v. J.H. Marshall & Associates,* 271 A.2d 404, 406 (D.C. 1970). Much less are courts free to insert words into a statute that is complete and clear on its face where, as here, the words would render the "operating" clause of the

---

**2.** *Compare Nova University v. The Board of Governors of the University of North Carolina,* 305 N.C. 156, 287 S.E.2d 872 (1982). North Carolina's licensing statute expressly authorizes licensing to confer degrees, and contains no licensing requirement to "operate." The North Carolina

court held that the statute could not be construed beyond its terms to authorize the Board to require a license for Nova's teaching of degree-credit courses in North Carolina where the degree was to be conferred in Florida.

statute superfluous and be contrary to the clear intent of Congress. *See Hurst v. V & M of Virginia, Inc.,* 293 Md. 575, 446 A.2d 55, 56–57 (1982).

The language of the statute, as well as its legislative history, plainly indicate Congress' intention to *comprehensively* regulate degree conferring institutions operating in the District of Columbia, whether the institutions were incorporated in the District or were foreign corporations seeking to operate in the District.

## IV.

We turn now to Nova's argument that § 29–815 violates the First Amendment "on its face"[3] and as applied to Nova. As discussed previously, D.C. Code § 29–815 requires private educational institutions incorporated in the District to obtain a license as a condition to conferring a degree. Nova does not challenge this aspect of the statute, stating that the District may arguably regulate the "conduct" of degree conferral. However, Nova contends that the additional statutory requirement that private schools incorporated elsewhere and which undertake to confer degrees obtain a license as a condition to "operating" in the District, is unconstitutional because it licenses and regulates "pure speech" on the basis of quality. Nova points out that it has the authority to confer degrees from the state of Florida and seeks only to *teach* its degree program in the District. Because the District has no extrajurisdictional power to regulate Nova's degree conferral, Nova contends that the District is *necessarily* licensing teaching.

■■■ We reject this argument at the outset as well as the artificial conduct/speech distinction Nova draws because it has no practical or First Amendment substance. First, § 29–815 does not regulate or license teaching or "pure speech." The "operat-

ing" clause of § 29–815 merely subjects out-of-District schools to the same regulations as schools incorporated in the District, *e.g.* both have unfettered freedom to teach so long as no degree credits or degrees are promised or given. According to the Senate Report, "[i]nstitutions which do not undertake to confer degrees do not come within the purview of this bill." S. REP. No. 611, 70th Cong., 1st Sess., at 4 (1928). The 1929 congressional statute was described in its title as an amendment to the D.C.Code "Relating to Degree-Conferring Institutions." Pub.L. No. 70–949, § 586a, 45 Stat. 1504 (1929). The statute itself states that schools incorporated in the District are required to obtain a license "to confer a degree," and schools incorporated elsewhere *"undertaking to confer a degree"* must obtain a license to "operate" in the District. The regulations setting forth the criterion for licensing are entitled "Regulations Relating to the Licensing of Institutions which Confer Degrees." The statutory penalties apply to anyone "who shall, directly or indirectly, participate in, aid, or assist in the conferring of any degree by any unlicensed ... institution ...." D.C.Code § 29–819 (1981). And in *Kraft v. Board of Education,* 247 F.Supp. 21, 25 (D.D.C.1965), *cert. denied,* 386 U.S. 958, 87 S.Ct. 1026, 18 L.Ed.2d 106 (1967), the court affirmed revocation of a license to award a degree, observing that the absence of a license did not prevent schools from teaching non-degree subjects or programs in the District. In short, Nova would not have needed to apply to the Commission for a license (an application requesting "a License to Offer Doctorate of Public Administration *Degree* Courses in the District of Columbia") nor would Nova be before this court if it did nothing in the District of Columbia but teach.

---

**3.** A facial challenge in this context is an assertion that the statute is unconstitutional not only as applied to Nova, but also in any conceivable application. *See City of Los Angeles v. Taxpayers For Vincent,* —— U.S. ——, ————, 104

S.Ct. 2118, 2124–25, 80 L.Ed.2d 772 (1984); *Secretary of State of Maryland v. Joseph H. Munson Co., Inc.,* —— U.S. ——, 104 S.Ct. 2839, 2852 n. 13, 81 L.Ed.2d 786 (1984).

Second, the District's power to regulate Nova is no different than its power to regulate educational institutions incorporated in the District. Nova does not and could not contest the power of the District to regulate degree conferral by its own institutions. *Compare New Jersey Board of Higher Education v. Shelton College,* 90 N.J. 470, 448 A.2d 988 (1982) *(Shelton II).* Educational institutions have no inherent or constitutional right to confer degrees; rather, degree conferral is business conduct, a corporate privilege conferred by the state of incorporation. *Id.* 448 A.2d at 990; *National Association of Certified Public Accountants v. United States,* 53 App.D.C. 391, 292 F. 668 (1923); *Townshend v. Gray,* 62 Vt. 373, 19 A. 635, 636 (1890). Schools are not shielded by the First Amendment from governmental regulation of business conduct deemed detrimental to the public merely because they are engaged in First Amendment activities. *See generally Associated Press v. NLRB,* 301 U.S. 103, 132–33, 57 S.Ct. 650, 655–56, 81 L.Ed. 953 (1937); *Grosjean v. American Press Co.,* 297 U.S. 233, 250, 56 S.Ct. 444, 449, 80 L.Ed. 660 (1936); *Kunda v. Muhlenberg College,* 621 F.2d 532, 550–51 (3d Cir.1980); *Shelton II, supra,* 448 A.2d at 996–97; *State ex rel. v. Clarksville School,* 636 S.W.2d 706 (Tenn.1982). Although Nova has the power to confer degrees from the state of Florida, as a foreign corporation, Nova has no constitutional right to operate its degree program in the District of Columbia, *e.g., WHYY, Inc. v. Borough of Glassboro,* 393 U.S. 117, 119, 89 S.Ct. 286, 287, 21 L.Ed.2d 242 (1968); *Paul v. Virginia,* 75 U.S. (8 Wall.) 168, 181, 19 L.Ed. 357 (1868), and the District may impose the same restrictions upon Nova as it imposes upon its own degree-conferring schools. *E.g. Northwestern National Life Insurance Co. v. Riggs,* 203 U.S. 243, 27 S.Ct. 126, 51 L.Ed. 168 (1906); *Orient Insurance Co. v. Daggs,* 172 U.S. 557, 19

S.Ct. 281, 43 L.Ed. 552 (1899); *Paul v. Virginia, supra; Watergate South, Inc. v. Duty,* 464 A.2d 141, 144 n. 5 (D.C.1983).

Finally, the most serious flaw in the conduct speech distinction drawn by Nova is that it has no First Amendment relevance and, if accepted, would undermine the very freedoms Nova asserts in this case.[4] As we have already stated, in requiring schools incorporated outside the District to obtain a license to operate degree programs in the District, the District is regulating no more and no less than when it requires schools incorporated in the District to obtain a license to confer a degree. The question in each case is whether the school meets minimal academic standards as set out in the statute and regulations. Yet under the conduct/speech distinction drawn by Nova, Nova may engage in exactly the same activities in the District as a college incorporated in the District, and although D.C.Code § 29–815 would have an identical impact on both schools, the District is absolutely prohibited by the First Amendment from regulating Nova but not from regulating a District school, merely because Nova is incorporated elsewhere. We cannot accept a theory of the First Amendment that conditions its protection on *where* a school is incorporated.

Our holding that D.C.Code § 29–815 regulates the business conduct of degree conferral and leaves schools free to teach does not end our First Amendment inquiry, for although degree conferral and the operation of degree programs are "privileges" granted by the District, the District can not place conditions on the receipt of these privileges that themselves violate the Constitution or require the receipt to forego the exercise of fundamental rights. *See, e.g., Keyishian v. Board of Regents,* 385 U.S. 589, 605–06, 87 S.Ct. 675, 684–85, 17 L.Ed.2d 629 (1967); *Speiser v. Randall,* 357 U.S. 513, 518, 78 S.Ct. 1332, 1338, 2

---

**4.** As to the problems with the conduct/speech distinction in First Amendment analysis, *see* L. TRIBE, AMERICAN CONSTITUTIONAL LAW, § 12–7 (1978); Ely, *Flag Desecration: A Case Study in*

*the Roles of Categorization and Balancing in First Amendment Analysis,* 88 HARV.L.REV. 1482, 1493–96 (1975).

**1182** ■■■■■■■■

L.Ed.2d 1460 (1958). Nor can the District regulate its businesses in ways that impinge on fundamental rights. *E.g., Frost Trucking Co. v. Railroad Commission of California,* 271 U.S. 583, 593–99, 46 S.Ct. 605, 607–09, 70 L.Ed. 1101 (1926).

■ Educational institutions, as well as individuals, have a First Amendment right to teach and to academic freedom. *Regents of the University of California v. Bakke,* 438 U.S. 265, 312, 98 S.Ct. 2733, 2759, 57 L.Ed.2d 750 (1978); *Griswold v. Connecticut,* 381 U.S. 479, 482–83, 85 S.Ct. 1678, 1680–81, 14 L.Ed.2d 510 (1965) (dicta); *Sweezy v. New Hampshire,* 354 U.S. 234, 250, 77 S.Ct. 1203, 1211, 1 L.Ed.2d 1311 (1957); *Keyishian, supra,* 385 U.S. at 603, 87 S.Ct. at 683;[5] *see generally* Finkin, *On "Institutional" Academic Freedom,* 61 Tex.L.Rev. 817 (1983). In his concurring opinion in *Sweezy v. New Hampshire,*[6] Justice Frankfurter characterized academic freedom as the right of an educational institution to be free from direct or indirect "governmental intervention in the intellectual life of a university," 354 U.S. at 262, 77 S.Ct. at 1218, and summarized the "four essential freedoms" that constitute academic freedom as the right of a university " 'to determine for itself on academic grounds who may teach, what may be taught, and how it shall be taught, and who may be admitted to study.' " *Id.* at 263, 77 S.Ct. at 1218. The Open Universities in South Africa 10–12 (A statement of a conference of senior scholars from the University of Cape Town and the University of the Withwatersrand, including A. v. d. S. Centlivres and Richard Feetham, as Chancellors of the respective universities) (footnote omitted).

■ It cannot be gainsaid that D.C. Code § 29–815, by requiring educational institutions to obtain a license as a condition to operating a degree program and predicating that license on meeting District criteria interferes with an educational institution's operation. In particular, Nova was denied a license because the Commission found that its library and faculty resources did not meet District requirements. However, to say that D.C.Code § 29–815 constrains a degree-granting educational institution's freedom to make decisions as to how an educational program will be run, is not to say that the constraints violate the First Amendment. Not every limit on institutional autonomy also implicates academic freedom. *See Kunda v. Muhlenberg College,* 621 F.2d 532, 547 (3d Cir.1980). The Supreme Court has recognized that First Amendment freedoms are not absolute and "the state may sometimes curtail speech when necessary to advance a significant and legitimate state interest." *City Council of Los Angeles v. Taxpayers for Vincent,* —— U.S. ——, ——, 104 S.Ct. 2118, 2128, 80 L.Ed.2d 772 (1984) (citing *Schenck v. United States,* 249 U.S. 47, 52, 39 S.Ct. 247, 249, 63 L.Ed. 470 (1919)). *See also Shelton II, supra,* 448 A.2d at 993–99.

■ In determining whether § 29–815 violates the First Amendment, we look first to whether the statute is content-neutral, for however valid the government's interest in regulating, it generally cannot be pursued by discriminating between particular viewpoints and information. *E.g., City Council of Los Angeles v. Taxpayers for Vincent, supra,* —— U.S. at ——–——, 104 S.Ct. at 2128–29. The Supreme Court has consistently recognized that if the constitutional guarantee means anything, it

---

**5.** Prior to application of the First Amendment to the states, the Supreme Court recognized the right to teach as a fundamental freedom protected by the Fourteenth Amendment. *Farrington v. Tokushige,* 273 U.S. 284, 47 S.Ct. 406, 71 L.Ed. 646 (1927); *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923).

**6.** In *Sweezy,* the Court reversed the contempt conviction of a professor called before a one-man state investigative "team" to answer questions regarding, *inter alia,* the content of his lectures. Although the court's plurality opinion rested on due process grounds, the Court stressed the threat to academic freedom that the conviction presented. *Sweezy, supra,* 354 U.S. at 250, 77 S.Ct. at 1211.

means that, ordinarily at least, "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Department of Chicago v. Mosley*, 408 U.S. 92, 95, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972); *e.g., Consolidated Edison Co. v. Public Service Commission*, 447 U.S. 530, 537, 100 S.Ct. 2326, 2333, 65 L.Ed.2d 319 (1980); *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 783, 98 S.Ct. 1407, 1419, 55 L.Ed.2d 707 (1978); *Bates v. City of Little Rock*, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960); *see generally* Farber, *Content Regulation and the First Amendment: A Revisionist View*, 68 Geo. L.J. 727 (1980); Redish, *The Content Distinction in First Amendment Analysis*, 34 Stan.L.Rev. 113 (1981).

 We think it evident that the general rule that forbids the government to regulate speech on the basis of content has no application to this case, for there is not even a hint of bias or censorship in Congress' enactment or the Commission's enforcement of D.C.Code § 29–815. In enacting § 29–815, Congress was not motivated by hostility to particular ideas, opinions, or educational philosophies,[7] nor was Congress concerned with harms that might occur from public exposure to particular information.[8] The sole interest of Congress was to ensure that degree-conferring educational institutions incorporated or operating in the District met minimal academic standards—*whatever* their message was, and to protect the public against harms arising from the abuse and misuse of degree-conferring powers, harms that arose independently of any message or teaching that might or might not precede degree conferral. On their face, the statutory and regulatory criteria for licensing are content neutral, censoring no subject, opinion, or educational philosophy. And contrary to Nova's suggestion, we do not believe that Commission inquiry into faculty qualifications, library resources, and curriculum content necessarily makes the statute content-related or amounts to a constraint on academic freedom.[9] This inquiry is limited to *neutral, sound, academic* criteria, not intended or likely to intrude upon the legitimate intellectual life of a university, but to ensure that when a university confers a degree, it does indeed have an intellectual life and the minimal resources essential to support that life. Nor is there any suggestion that the Commission denied Nova a license because of the particular subjects it teaches, content of books it provides, or views of its teachers. Nova was denied a license because the Commission found that Nova's plans to use Howard University's library facilities rather than providing their own, and Nova's use of field-based teachers with no resident faculty in the District,

---

7. *Compare Keyishian v. Board of Regents, supra,* and *Sweezy, supra,* where government intervention in university life was motivated by hostility to a political philosophy.

8. *Compare Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), where the state invalidly prohibited the teaching of foreign languages because of concern that it prevented immigrant assimilation into American society; and *Linmark Assocs. Inc. v. Township of Willingboro,* 431 U.S. 85, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977), where a township invalidly prohibited posting of For Sale signs in yards due to its belief that this information promoted "white flight" from neighborhoods.

9. *See generally* Finkin, *supra* at 854, where the author distinguishes institutional autonomy from academic freedom, and concludes that when the state does not directly regulate teaching or research, the question of whether a restraint on institutional autonomy is also an unconstitutional restraint on academic freedom will depend in each case on the purpose and effect of governmental action, "its compatibility with the academic enterprise, whether procedural safeguards for the institution are available, and the likely effect of the inquiry on academic freedom and the conduct of educational affairs." *Id.* at 855. In this regard, the author contrasts the loyalty-security investigations of professors in the 1950's, *e.g., Sweezy, supra,* the purpose and effect of which were "bluntly antithetical" to academic freedom, with state regulation of degree-conferring institutions on the basis of sound academic criteria, which might involve inquiry into faculty quality and content of curriculum, but does not constitute an impermissible invasion of academic freedom.

did not meet the District's requirements for adequate faculty and library resources. Although application of the statute to Nova may be burdensome in a financial and administrative sense, and limits Nova's institutional prerogatives, we do not believe these constraints intrude upon Nova's right to academic freedom or free speech. It cannot be said that requiring a library and teachers is incompatible with the academic endeavor or with intellectual freedom within a university.[10]

■■■ When governmental regulation, as in this case, is not aimed at the content of speech but nevertheless has an incidental impact on the exercise of communicative activity, the regulation will not violate the First Amendment so long as it does not *unduly* restrict the communication of ideas. *Cox v. New Hampshire,* 312 U.S. 569, 574, 61 S.Ct. 762, 765, 85 L.Ed. 1049 (1941); *see also Konigsberg v. State Bar,* 366 U.S. 36, 50–51, 81 S.Ct. 997, 1006–1007, 6 L.Ed.2d 105 (1961).

In *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), the Supreme Court set forth the framework for reviewing a viewpoint neutral regulation of this kind:

[A] government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest

is unrelated to the supression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*Id.* at 377, 88 S.Ct. at 1679.

We have already addressed the power of the District to regulate the business activities of its own educational institutions and we have held that the District's interest in this case is not aimed at suppressing speech, but rather in preventing the harms that arise when educational institutions abuse their degree-conferring authority. Thus, the critical inquiries in this case are whether D.C.Code § 29–815 furthers a substantial interest and whether the effect of the statute on speech and academic freedom is no greater than necessary to protect the District's interest.

■■■ The interest that the District asserts is that of ensuring minimal educational standards among degree-conferring institutions within its borders. The substantial interest and broad discretion that the state has in regulating its schools and the quality of education provided to its citizens is also well established. *Meyer v. Nebraska, supra* note 8; *see also Vlandis v. Kline,* 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973); *Wisconsin v. Yoder,* 406 U.S. 205, 213, 92 S.Ct. 1526, 1532, 32 L.Ed.2d 15 (1972); *Lemon v. Kurtzman,* 403 U.S. 602, 613, 91 S.Ct. 2105, 2112, 29 L.Ed.2d 745

---

**10.** *See Kunda v. Muhlenberg College,* 621 F.2d 532 (3d Cir.1980), a Title VII case in which the court held that a court order reinstating and granting tenure to a professor did not interfere with the academic freedom of a university where the employment decision was not made on academic grounds, noting that "[i]t does not follow that because academic freedom is inextricably related to the educational process it is implicated in every employment decision of an educational institution." *Id.* at 547.

Nova contends that the expert testimony it presented, particularly that of the Chairman of Harvard University's Government Department, compels us to overturn the Commission's decision. By a post-argument submission, Nova calls our attention to a recent decision of the United States Supreme Court in *Secretary of State of Maryland v. Joseph H. Munson Co.,* —

U.S. ——, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984). We find nothing in *Munson* which compels a decision contrary to the one we reach. In the hearing before the Commission, there was conflicting expert testimony. For example, the Dean of the School of Community and Public Affairs at Virginia Commonwealth University was critical of the faculty arrangements provided by Nova, and questioned whether these provisions would meet the national standards of the National Association of Schools of Public Affairs. There was other expert testimony that was similarly critical, both as to faculty arrangements and as to library facilities. The Commission was entitled to choose which expert testimony it credited. *Citizens Association of Georgetown, Inc. v. District of Columbia,* 402 A.2d 36 (D.C.1979) (en banc).

(1971); *Hamilton v. University of California*, 293 U.S. 245, 260–62, 55 S.Ct. 197, 203–04, 79 L.Ed. 343 (1934); *Pierce v. Society of Sisters*, 268 U.S. 510, 534, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925); *Marjorie Webster Jr. College v. Middle States Association of Colleges and Secondary Schools, Inc.*, 139 U.S.App.D.C. 217, 221 & n. 19, 432 F.2d 650, 654 & n. 19, *cert. denied*, 400 U.S. 965, 91 S.Ct. 367, 27 L.Ed.2d 384 (1970).

The interest the District has in regulating degree conferral was well set out by the New Jersey Supreme Court in *Shelton College v. State Board of Education*, 48 N.J. 501, 226 A.2d 612 (1967) *(Shelton I)*, in which the court upheld a licensing scheme similar to our own in the face of a First Amendment freedom of speech challenge.[11] In *Shelton I*, the court began by holding that New Jersey had the constitutional power to and interest in regulating private educational institutions, quoting Chief Justice Marshall's statement in *Trustees of Dartmouth College v. Woodward*, 17 U.S. (4 Wheat.) 518, 4 L.Ed. 629 (1819): "That education is an object of national concern, and a proper subject of legislation, all admit." *Shelton I, supra*, 226 A.2d at 618. The court further found that regulation of degree conferral was especially appropriate "evidential as it is of academic achievement" and "'intimately related to the public welfare'". *Id.* (quoting ELLIOTT, THE COLLEGES AND THE COURTS at 200 (1936)). Rejecting Shelton College's suggestion that the public needed no protection from nonprofessional degree programs, the court noted:

[G]overnment and private segments of our society look to the degree for evidence of achievement and capacity.... Indeed, ... some or all of the study required for a bachelor degree is prerequisite for most professional degrees, and licensing authorities, ... must depend upon the quality of the instruction given by the colleges, academic as well as professional.

*Shelton I, supra*, 226 A.2d at 619. As to Shelton's suggestion that private accreditation societies are adequate to deal with the problem, the court responded that as useful as private accreditation societies are in developing standardization with respect to degrees, they "cannot stop the substandard school or close the out-and-out degree mill." *Id.* Finally, the court noted that educators themselves had called for stricter state regulation of academic standards for degrees since the turn of the century and quoted from a proposed model statute prepared in 1961 by the Council of State Governments, as "sum[ming] up the public need for regulation" of institutions that confer degrees:

It is the policy of this state to prevent deception of the public resulting from the conferring and use of fraudulent or substandard degrees. Since degrees, diplomas and similar measures of academic achievement are constantly used by employers in judging the training of prospective employees; by public and private professional groups in determining qualifications for admission to and continuance of practice; and by the general public in assessing the extent of competence of persons engaged in a wide range of activities necessary to the general welfare, regulation by law of such evidences of academic achievement is in the public

---

11. The New Jersey statute prohibited the conferral of a degree or the "furnish[ing of] instruction" for the purpose of conferring degrees, except by licensed institutions. *Shelton I, supra*, 226 A.2d at 616. Following this decision, Shelton College, a small religious school, moved to Florida, where it obtained a license to confer bachelor's degrees. Shelton returned to New Jersey eight years later and began to offer credit courses leading to a degree by the authority of Florida. This action spawned extensive litigation culminating in *Shelton II, supra*, in which the court upheld an injunction which prevented Shelton from awarding course credits or degrees in New Jersey without a license and rejected Shelton's claim that licensing violated their First Amendment right to exercise their religion. *See generally* Kirk, *Shelton College and State Licensing of Religious Schools: An Educator's View of the Interface Between the Establishment and Free Exercise Clauses*, 44 LAW & CONTEMP.PROBS. 169 (Spring 1981).

interest. To the same end, the protection of legitimate institutions and of those holding degrees from them is also in the public interest.

*Id.* at 620.

These tenets were reiterated by the New Jersey Supreme Court in *Shelton II.*

Like the New Jersey Supreme Court, we find that the District's interest in this case is substantial. Indeed, as already discussed, such regulation is essential if the purposes of the statute are to be met. *See* discussion, *supra* at 1179.

Nova contends that however substantial the District's interests are, they are not being furthered by the licensing statute. First, Nova points out that education in our society occurs in a national marketplace and that the District cannot prevent persons, including its own citizens, from receiving degrees from other jurisdictions with less stringent incorporation and degree conferral laws, and then returning to the District to use the degree. Second, Nova argues that the licensing criteria are not rationally related to determining whether an educational institution is substandard.

We do not agree that the licensing statute is ineffective in or unrelated to accomplishing the District's purposes. We reject at the outset any suggestion that because the District cannot impose its educational standards nationwide, the statute is ineffective and the District must forego all attempts to ensure that educational standards are met by those schools operating in the District. Moreover, Nova's assertion that the licensing criteria are unrelated to determining whether an educational institution is substandard is not only incorrect but flows from the erroneous premise that nothing less than actual proved fraud or lack of quality would justify denying Nova a license. Section 29–815 is a prophylactic

regulation—intended to prevent harm before it occurs. The Commission in denying a license is not deciding that an educational institution is in fact "substandard, transient, unethical, deceptive, or fraudulent," D.C.Code § 31–1601(1) (1981), but rather that the applicant's failure to meet District criteria creates the probability that the harms with which the District is concerned will occur. We do not believe it can be accurately said that the licensing criteria in general and as specifically applied to Nova are not generally recognized indicia of legitimate and minimally qualified institutions of higher learning.[12] Moreover, the regulations expressly recognize that the criteria will not apply equally in all situations, thereby providing the flexibility essential to ensure quality and legitimacy without discouraging diversity and innovation in higher education or injuring nascent education institutions. In this case, the Commission's perception of the potential for harm was not unreasonable, and the efficacy of the District's efforts to prevent harm to prospective employers and students would be substantially diminished if the state could act only after injury occurred.

The next question we must ask is whether the effect of § 29–815 on the free speech and academic freedom of educational institutions is no greater than necessary to further the District's interests. Nova contends that the principle that statutes touching First Amendment freedoms must be narrowly drawn dictates that the District must aim specifically at the fraudulent educational institutions and the out-and-out diploma mill and leave "quality" determinations to private accrediting associations and the educational consumer. This argument not only ignores the practical difficulties of detecting illegal activities by educational institutions and successfully prosecuting them under criminal fraud laws but over-

---

**12.** *Compare Secretary of State of Maryland v. Joseph H. Munson Co., supra* note 10, in which the Supreme Court struck down as overbroad a Maryland statute prohibiting charitable organizations from paying more than 25% of the amount raised to fundraising activities because the statute operated on the "fundamentally mistaken premise that high solicitation costs are an accurate measure of fraud." *Id.* —— U.S. at ——, 104 S.Ct. at 2852.

looks the fact that the District has a substantial interest in preventing degree conferral by non-fraudulent but nevertheless substandard educational institutions. And although private accrediting institutions serve a valuable role in providing information to the public regarding the academic standards at various schools, these organizations are voluntary and can do nothing to prevent the substandard or fraudulent school from conferring a degree. Requiring full disclosure from schools and letting the educational consumer choose is inadequate. That individuals may choose with full knowledge to spend their money for a degree that has no academic substance does not mean that the District may not act to foreclose that choice where it is inherently harmful to the integrity of legitimate educational institutions, employers, and the public in general.

Finally, Nova asserts that § 29–815 creates such substantial burdens on the exercise of First Amendment freedoms that it cannot be justified despite the District's substantial interest. Specifically, Nova points to the lengthy and expensive administrative process it went through only to be denied a license in the final analysis "merely" because Nova would provide no library of its own and would utilize national faculty rather than placing any faculty in the District. Although we recognize the burdens this statute places on Nova, we do not believe they amount to a First Amendment violation. There is simply no evidence that the length and complexity of the administrative process in this case arose from a lack of diligence on the Commission's part or of covert hostility toward Nova's educational program, or any particular subject taught or opinion held by Nova's teachers. Nova's application was denied without prejudice and the record reflects that the Commission is prepared to exercise the flexibility provided for in the Regulations to accommodate Nova's external degree program. Requiring Nova to provide some resident faculty and a library for District students does not prevent Nova from implementing its unique field-based pro-

gram—it merely requires Nova to devote more resources to the program in the District.

In conclusion, Nova has failed to demonstrate that the District's licensing requirement is inherently, or as applied to Nova, an unreasonable limitation of educational institutions' right to free speech and academic freedom. We are reassured in our conclusion by the fact that applicants for a license are entitled to extensive procedural protections, including judicial review, for we are not unmindful that regulation of schools in the name of quality not only poses risks to First Amendment freedoms but could have the effect of discouraging the innovation, diversity, and vitality that we value in a pluralistic society. Nevertheless, we believe that the very importance of these institutions to the citizens of the District and to society at large negate any suggestion that the state does not have a substantial and indeed compelling interest in regulation that advances the quality and integrity of higher education.

██ Requiring degree-conferring institutions to meet reasonable academic standards is not only in the best interests of the public, but also in the best interests of educational institutions, for in the last analysis, the viability of such institutions depends in large part on public esteem and support. The First Amendment cannot be used as a shield to protect substandard or fraudulent degree conferring educational institutions and the District can insist that schools who operate degree programs in the District provide the minimal resources and education appropriate to the degree conferred.

## V.

Nova next contends that the statutory standards for licensure violate the First Amendment because they are impermissibly vague. Having held that § 29–815 is not void on its face and has only an incidental and limited impact on speech, Nova's vagueness challenge can succeed

only if the enactment is impermissibly vague in all of its applications. A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others. A court should therefore examine the complainant's conduct before analyzing other hypothetical applications of the law.

*Hoffman Estates v. Flipside, Hoffman Estates,* 455 U.S. 489, 495, 102 S.Ct. 1186, 1191, 71 L.Ed.2d 362 (1982) (footnote omitted).

In due process vagueness challenges we look to see whether the statute provides explicit standards so that the law gives "the person of ordinary intelligence a reasonable opportunity to know what is prohibited," and prevents "arbitrary and discriminatory applications." *Grayned v. City of Rockford,* 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972). *E.g., District of Columbia v. Gueory,* 376 A.2d 834 (D.C.1977). Whether a statute is sufficiently precise will "depend in [large] part on the nature of the enactment." *Hoffman Estates v. Flipside Hoffman Estates, supra,* 455 U.S. at 498, 102 S.Ct. at 1193. Business regulations are not subject to a strict vagueness test, not only because the subject matter regulated is often more narrow, *e.g., Papachristou v. City of Jacksonville,* 405 U.S. 156, 159, 162, 92 S.Ct. 839, 841, 843, 31 L.Ed.2d 110 (1972) (dictum; collecting cases), but also because businesses can be expected to investigate relevant legislation and plan behavior accordingly. *E.g., United States v. National Dairy Products Corp.,* 372 U.S. 29, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963). Additionally, the regulated enterprise often has the opportunity to clarify their standards through their own inquiry as well as through the administrative process. *See Joseph E. Seagram & Sons v. Hostetter,* 384 U.S. 35, 49, 86 S.Ct. 1254, 1263, 16 L.Ed.2d 336 (1966); *McGowan v. Maryland,* 366 U.S. 420, 428, 81 S.Ct. 1101, 1106, 6 L.Ed.2d 393 (1961). Finally, perhaps the most important factor affecting the clarity that a law must have is whether it threat-

ens to inhibit the exercise of constitutionally protected rights of free speech. *E.g., Grayned v. City of Rickford,* 408 U.S. at 109, 92 S.Ct. at 2299.

The statute at issue here is a business regulation that Nova has had ample opportunity to clarify. The licensing criteria at issue relate to the number of faculty Nova is required to provide and the type of library resources, implicating First Amendment rights tangentially, if at all. Applying the standard of review appropriate under these circumstances, Nova's facial challenge must fail, for the statute and regulations are sufficiently clear as applied to Nova.

D.C.Code § 29–815 requires Nova to have "faculty ... of reasonable number" for the number and nature of courses taught, and the Regulations require, in relevant part, "a sufficient number of full-time teaching appointments to ensure continuity and stability of the educational program, as well as to provide adequate educational association between students and faculty." Regulations § III(4)(b). As to library requirements, § 29–815 requires Nova to "possess [] ... suitable ... library equipment" and the Regulations require that the library have a "collection of books ... adequate for the needs of the [particular] educational program [offered]; continuous acquisition of current library materials[;] ... professionally trained staff[; and adequate] ... seat[ing] and work space." Regulations § III(8)(a)–(d). We simply cannot agree that Nova was not put upon notice by the language of the statute and regulations as well as the interaction with Commission staff prior to the hearing that using another school's library and relying exclusively on field-based professors in a doctoral program would not satisfy the District's requirements. Moreover, we note that the Commission has offered to meet with Nova to clarify exactly what Nova must do to meet District requirements. We are not persuaded that

the standards did not give Nova "fair notice" of what was required.

■■■ Nova also contends that the statute and regulations provide insufficient standards for enforcement, permitting ad hoc and discriminatory action by the Commission on invidious and irrelevant grounds. However, Nova presents no evidence that the statute has been enforced in this case in a discriminatory manner or with the aim or effect of inhibiting free speech or academic freedom. Although the terms "adequate", "sufficient" and "reasonable" leave room for discretionary enforcement, the constitutional sufficiency of these terms cannot be judged in a vacuum. The context must be considered, *e.g.,* *American Communications Association v. Douds,* 339 U.S. 382, 412, 70 S.Ct. 674, 691, 94 L.Ed. 925 (1950), because the context not only gives concreteness to what seems abstract, but it also demonstrates that despite its generality, a broad standard is all that sensibly may be expected if the Commission is to be equal to the sundry situations that may arise. Here the regulations acquire content not only from the overall objective of the statute to prevent fraudulent, substandard, transient and unethical degree conferring schools from operating in the District but also from the Commission's use of local reputable institutions offering similar programs as a reference point. Greater specificity, would not only be a practical impossibility, given the wide variety of educational programs and institutions the Commission must consider, but would infringe to a greater extent on legitimate educational choices. Finally, the potential for discriminatory or unconstitutional application of these standards is lessened by the procedural protections accorded to applicants under the statute and regulations. "No statute bears an absolute guarantee that it will always be applied within constitutional bounds; consequently, no such guarantee can be demanded." *Secretary of State of Maryland v. Joseph H. Munson Co., supra,* 104 S.Ct. at 2857

(Rehnquist, J., dissenting). At this stage we are not prepared to hold that the imprecision of these terms jeopardizes the entire statute. "Although it is possible that specific applications ... may engender concrete problems of constitutional dimension, it will be time enough to consider such problems when they arise." *Joseph E. Seagram & Sons v. Hostetter, supra,* 384 U.S. at 52, 86 S.Ct. at 1265 (1966).

## VI.

The final question we address is whether the Commission's decision to deny Nova a license was error under D.C. law. The Commission's denial was based on its conclusion that Nova did not meet the District's requirements for adequate full time faculty and adequate library resources as set out in relevant part below:

> That considering the number and character of courses offered, the faculty is of reasonable number and properly qualified, and that the institution is possessed of suitable ... library equipment.

D.C.Code § 29–815(4).

> There shall be a sufficient number of full-time teaching appointments to ensure continuity and stability of the educational program, as well as to provide adequate educational association between students and faculty.

Regulations § III(4)(b)

> The collection of books, periodicals, newspapers, ..., shall be adequate for the needs of the educational programs of the institution, and shall be readily accessible to the faculty and the students. Provisions shall be made for the continuous acquisition of current library materials and for the recording of all library holdings.

Regulations § III(8)(a)(b)

The facts upon which the Commission rested its conclusion that Nova did not meet the District's library and faculty standards are essentially undisputed.[13] As to

---

**13.** The record suggests that the Commission also

concluded that Nova did not meet District stan-

library facilities, the Commission found that Nova had no library in the District of Columbia and no plans to establish one. Rather, Nova arranged with George Mason and Howard Universities to have their libraries available for Nova's students, and intended to rely on existing public and governmental institutions in the District.

As to faculty resources, the Commission found that Nova's faculty for the DPA program consisted of nine full-time Florida members and 33 part-time national faculty members (preceptors) for a projected 15 clusters, or approximately 380 students. The Florida faculty provides 50% of the DPA instruction as well as teaching in other departments and performing administrative duties. The turnover rate among the Florida faculty was 50% between August 1981 and August 1982. As we have previously stated, the preceptors, who contract with Nova to teach specific courses at the various clusters, are scholars prominent in the public administration field. Each cluster, consisting of 20–25 students, is coordinated by a cluster director, who is a part-time contractor, paid monthly by Nova under a three-year contract, and generally employed in a full-time position elsewhere. Cluster directors administer comprehensive examinations, arrange and assist in cluster sessions, counsel students, and assist the faculty in research and reading of student papers. Other than the contract students have with preceptors and cluster directors during weekend teaching sessions, contact is by special appointment, telephone and written communication.

Based upon these findings, the Commission concluded that Nova did not meet the District's requirements for adequate full-time faculty and library resources. The Commission interpreted the statute and regulations as requiring Nova to satisfy the District's faculty requirements independently of Nova's staff at its principal insti-

tution in Florida and as requiring Nova to provide its *own* library. On the basis of these deficiencies, the license was denied. This denial was without prejudice to Nova renewing its application and the Commission offered to advise Nova as to how Nova could meet these requirements.

Nova does not dispute the factual findings upon which the Commission based its conclusion, but argues that the Commission's conclusion was wrong—that in fact Nova did meet the District's requirements and that the Commission's conclusion that Nova must meet faculty requirements *in the District* independently of its faculty resources elsewhere and must establish its *own* library was an unreasonable and erroneous interpretation of the statute and regulations.

■■■ This court does not undertake a de novo review of the record in an administrative proceeding. *E.g., Pendleton v. District of Columbia Board of Elections and Ethics,* 449 A.2d 301, 307 (D.C.1982). Rather, we examine the record to determine whether the conclusion is reasonable, and based on "reliable, probative, and substantial evidence" of record. *Id.* at 304 (citing D.C.Code § 1–1509(e) (1981)). "Substantial evidence is more than a mere scintilla [of evidence]; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Jameson's Liquors, Inc. v. District of Columbia Alcoholic Beverage Control Board,* 384 A.2d 412, 418 (D.C.1978) (citations omitted) (quoting *The Vestry of Grace Parish v. District of Columbia Alcoholic Beverage Control Board,* 366 A.2d 1110 (D.C.1976)). Moreover, when an agency's decision is based on an "interpretation of the statute and regulations it administers, [that interpretation] will be sustained unless shown to be unreasonable or in contravention of the language or legislative history of the

---

dards related to clear delineation of administrative control. We do not address this question in that the Commission's decision is supported by its conclusions regarding library and faculty requirements. We need not consider whether

resting our holding on only two of the three prongs relied upon by the Commission should cause us to consider remanding to the Commission because at oral argument Nova specifically rejected any possible remand remedy.

statute." *DeLevay v. District of Columbia Rental Accommodations Commission,* 411 A.2d 354, 359 (D.C.1980) (citations omitted). We hold in this case that the Commission's denial was based on substantial evidence and was reasonable and consistent with the language and purpose of the statute.

The record reflects that the Commission's concern was that *none* of Nova's faculty, full-time or otherwise, was consistently present in the District of Columbia. Considerable evidence was presented during the hearing regarding the importance in doctoral programs of face-to-face interaction between faculty and students, particularly for supervision and counseling during research projects. Not only was student-faculty interaction significantly reduced by the lack of any Nova faculty in the District, but evidence suggested that Nova's nine DPA faculty members in Florida could not provide adequate supervision and continuity in that they were non-tenured, subject to high turnover rates, and had significant responsibilities outside the DPA program. And despite the recognized excellence of Nova's preceptorial faculty, these teachers had only limited contact with students. Under these circumstances, the Commission's conclusion that Nova must satisfy faculty requirements in the District independently of its faculty in Florida was not unreasonable, and its conclusion that Nova's plans did not provide for sufficient full-time faculty to assure adequate interaction between faculty and student and continuity and stability in the overall program was supported by substantial evidence.

Nor do we believe that the Commission's conclusion that Nova did not meet the District's requirements for adequate library resources was unsupported by substantial evidence or erroneous as a matter of law. D.C.Code § 29–815(4) requires degree-conferring institutions to "possessed of suitable ... library equipment." The Regulations require, *inter alia,* an adequate "collection of books" and "continuous acquisition of current library materials." Regulations § III(8)(a)(b). The Commission reasonably interpreted this language as requiring educational institutions to establish their own libraries, rather than rely on the public or private libraries otherwise available in the District or suburbs of the District. This interpretation is consistent not only with the language but with the purpose of the statute in that it ensures that an educational institution has materials appropriate to the degree program as well as library hours that meet student needs and assures some degree of stability and continuity due to the substantial investment it requires from an institution. Of course, the Commission has the discretion to waive this as well as other requirements when it believes the requirement is inapplicable or unnecessary in particular cases. However, we cannot say that the Commission's failure to do so in this case was irrational or not based on substantial evidence. Not only were Nova's arrangements with Howard and George Mason Universities contrary to the express mandate of the statute and regulations, Nova's arrangements did not ensure that the purposes of this requirement would be met. As the Commission points out, George Mason and Howard University do not have doctoral programs in public administration and Nova would have no control over their acquisitions; the arrangements have no guaranty of permanence because any of the schools could revoke the agreements; and Nova is not committed to an investment that would encourage stability and permanence of their program in the District.

Finally, we cannot say that the Commission erred in its conclusion that the library and faculty deficiencies in Nova's program justified denying Nova a license. In this regard, we note that in denying Nova a license the Commission is not holding that Nova's program is in fact substandard, but rather that certain deficiencies present an unacceptable risk that the program will be "substandard" or "transient" or will result in the conferral of "false or misleading" degrees. D.C.Code § 31–1601(1), (2) (1981).

Given the complete lack of faculty and library resources in the District, who hold that the Commission's decision was justified by the evidence and in accord with the law.

*Affirmed.*