IN THE SUPREME COURT OF TEXAS








IN THE SUPREME COURT OF TEXAS
 
════════════
No. 03-0995
════════════
 
HEB Ministries, Inc., 
Southern Bible Institute, and Hispanic Bible Institute, Petitioners,
 
v.
 
Texas Higher Education 
Coordinating Board and Commissioner Raymund Paredes, Respondents
 
════════════════════════════════════════════════════
On Petition for Review from the
Court of Appeals for the Third District of 
Texas
════════════════════════════════════════════════════
 
 
Argued January 5, 
2005
 
 
            
Justice Wainwright, joined by 
Justice Johnson, concurring in 
part and dissenting in part, and concurring in the judgment.
 
            
Today the Court reaffirms the sacred principle that Americans have a fundamental 
right to their religious beliefs. The United States Constitution prohibits the 
government from interfering with this liberty, as the state has no authority to 
regulate religious beliefs. I concur in the Court’s result on all issues 
decided, some for different reasons, except one. I agree that the government 
cannot dictate whether private religious institutions may call themselves 
“seminaries” as the term admits primarily a religious connotation. Because the 
training of clerics and teaching of religious doctrines at religious 
institutions is inherent to religious beliefs, the State also cannot license 
clerics or regulate their training. I also agree that the government may not 
preclude religious institutions from employing virtually any useful terminology 
to describe the postsecondary educational achievements of their students, but I 
would hold, contrary to the plurality, that the State, within constitutional 
limits, may require private educational institutions to comply with minimum 
educational criteria before they may confer postsecondary degrees on their 
students. A holding that the Legislature is barred by the U.S. Constitution from 
setting minimum standards for the issuance of college and graduate degrees by 
religious institutions, establishes a constitutional right for one type of 
institution to issue postsecondary degrees regardless of compliance with public 
standards. This holding precludes the Legislature from considering permissible 
alternatives, such as allowing religious institutions to issue college degrees 
with appropriate disclosures on their graduation documents indicating that their 
degrees are not from state-certified programs (if, for example, they do not 
include required minimum study in mathematics, science, humanites, written communication, basic computer 
instruction, or other subjects). This would permanently tie the hands of the 
Legislature, precluding it from considering constitutionally permissible 
alternatives so that it may concurrently protect religious freedom while 
ensuring that all private postsecondary degrees from Texas institutions 
represent meaningful educational achievement. The Religion Clauses of the First 
Amendment of the Constitution do not compel this result. The plurality’s logic 
goes astray in melding the act of issuing a postsecondary graduation document 
with the absolute right to religious beliefs, and fails to recognize that the 
Legislature’s ensuring that all postsecondary degrees are meaningful 
designations is not an improper targeting of Tyndale’s 
religious beliefs. The government may not under the Constitution dictate which 
religious institutions call themselves seminaries, whom they may hire to teach 
and what curriculum they may teach, but calling a graduation document a 
bachelor’s degree, instead of a bachelor’s certificate, is not an issue of 
religious beliefs, notwithstanding Tyndale’s attempt 
to conflate the two. I also concur with the plurality, for different reasons, 
that religious institutions have the right to accurately label their graduation 
documents, as the Free Speech Clause of the Constitution precludes the State 
from broadly barring private postsecondary institutions from using virtually all 
terminology that reasonably describes the educational attainment of their 
students.
I
Background
            
Petitioner HEB Ministries, Inc.[1] is a non-profit 
Texas 
corporation and orthodox Christian church that operates, as one of its 
ministries, the Tyndale Theological Seminary and Bible 
Institute.[2] Tyndale 
provides undergraduate and graduate level education to students in 
ecclesiastical subjects such as theology, apologetics, and Christian studies, 
and also provides general-education courses such as English grammar, 
composition, and ancient world history. The Texas Higher Education Coordinating 
Board fined Tyndale for using terms protected by the 
Education Code in its name and for issuing some graduation documents to its 1998 
graduates which, while not using the protected term “degree,” are advertised by 
Tyndale as equivalent to a degree or as satisfying 
part of a state-certified postsecondary degree program.
            
The Board fined Tyndale $3,000 for using the term 
“seminary” in violation of section 61.313(a)(1) of the 
Education Code.[3] For “doctrinal reasons” and fear of 
jeopardizing its “ecclesiastical rights,” Tyndale did 
not seek a temporary certificate of authority from the Board, nor longer-term 
accreditation from a state-approved accrediting agency.[4] Tyndale now 
argues that the twenty-one state-mandated standards required for accreditation 
or a certificate of authority are impermissibly 
intrusive. See 19 Tex. Admin. Code § 7.7. For example, Tyndale claims that the regulation regarding faculty 
qualifications would prohibit Reverend Billy Graham, Mother Teresa, the 
Apostles, and a Jewish carpenter born in a manger from teaching at the 
institution.
The 
Board also fined Tyndale $170,000 for purportedly 
issuing “degrees”—as statutorily defined—in violation of section 61.304 of the 
Education Code. Section 61.304 prohibits private postsecondary institutions from 
granting “degrees” without first obtaining a certificate of authority from the 
Board or becoming accredited by a state-approved accrediting agency. Tex. Educ. Code § 61.304; see also 
id. § 61.303(a) (exempting accredited institutions). “Degree” is broadly 
defined as  
 
any title 
or designation, mark, abbreviation, appellation, or series of letters or words, 
including associate, bachelor’s, master’s, doctor’s, and their equivalents, 
which signifies, purports to, or is generally taken to signify satisfactory 
completion of the requirements of all or part of a program of study leading to 
an associate, bachelor’s, master’s, or doctor’s degree or its equivalent.
 
 
Id. § 
61.302(1). None of the documents awarded by Tyndale at its 1998 graduation were actually titled 
“degree,” but the Board alleges that Tyndale used 
terminology on the documents and in brochure descriptions that bring the 
documents within the broad definition of “degree” in section 61.302(1). Though 
not evident from the statutory language, the Board now concedes that issuing 
“diplomas” or “certificates,” without the protected words or brochure 
descriptions, is not a violation of section 61.304.
            
In response to the Board’s fines, Tyndale filed this 
lawsuit seeking a declaratory judgment that applicable sections of the Texas 
Education Code are unconstitutional under the Free Speech, Free Exercise, and 
Establishment Clauses of the First Amendment of the United States Constitution, 
and under the Freedom of Worship Clause in Article I, section 6 of the Texas 
Constitution. Both Tyndale and the Board filed motions 
for summary judgment. In its ruling on these motions, the trial court upheld the 
fines assessed against Tyndale for granting “degrees,” 
under section 61.304, but vacated the fine for Tyndale’s use of the term “seminary,” under section 
61.313(a)(1), holding that the State’s regulation of 
that term violated the First Amendment of the United States Constitution and 
Article I, sections 6, 8, and 20 of the Texas Constitution.
            
The court of appeals reversed the trial court’s judgment allowing unregulated 
use of the term “seminary” and rejected Tyndale’s Free 
Exercise, Establishment Clause, and Free Speech challenges. 114 S.W.3d 617, 633-36. The court of appeals affirmed the 
trial court’s judgment with respect to the granting of degrees, holding that 
section 61.304 does not violate the Establishment Clause, the Free Exercise 
Clause, or Tyndale’s right to free speech. Id. at 
628-29, 631-32.
II
Constitutional 
Prohibition Against State
Regulation of 
Religious Convictions
 
            
The Religion Clauses provide that “Congress shall make no law respecting an 
establishment of religion, or prohibiting the free exercise thereof.”[5] U.S. Const. amend. I. They apply to the states through the doctrine of 
incorporation in the Fourteenth Amendment. Cantwell v. 
Connecticut, 310 U.S. 296, 303 
(1940). The Free Exercise Clause erects an unqualified prohibition 
against government interference with beliefs. State v. 
Corpus Christi People’s Baptist Church, Inc., 683 S.W.2d 692, 695 
(Tex. 
1984). The Clause also protects certain conduct motivated by religious 
beliefs. United 
States v. Lee, 455 
U.S. 252 (1982). Under the 
Establishment Clause, the state may not prefer religion to irreligion or one 
religion to others, nor may the government exhibit hostility towards religion. 
Everson v. Bd. of Educ. of Ewing, 330 U.S. 1, 
15-16 (1947); see also Bd. of Educ. of Kiryas Joel Village School Dist. v. Grumet, 512 U.S. 687, 703 (1994); Lee v. Weisman, 
505 U.S. 577, 609-16 (1992) (Souter, J., concurring). 
These constitutional principles guide the evaluation of the state regulations at 
issue.
A. The Free Exercise Clause
            
The United States Constitution protects the free exercise of religion from undue 
state infringement. U.S. Const. 
amend I, cl. 2, amend XIV, § 1; Cantwell v. 
Connecticut, 310 U.S. 296, 303 (1940); see also 
Tex. Const. art. I, §§ 
6, 29.[6] The Free Exercise Clause of the First 
Amendment protects religious freedom by ensuring that the freedom to hold 
religious beliefs and opinions is absolute. Braunfeld v. Brown, 
366 U.S. 599, 603 (1961). This was 
reiterated in Employment Division v. Smith, where the Supreme Court held 
that “the First Amendment obviously excludes all ‘governmental regulation of 
religious beliefs as such.’” 494 U.S. 872, 877, 879 (1990) (quoting Sherbert v. Verner, 
374 U.S. at 402 (1963)). The first issue 
is whether the statutes at issue regulate religious beliefs.[7]
1. State Regulation of the Term “Seminary”
            
Section 61.313(a) of the Texas Education Code requires that all private 
postsecondary educational institutions in Texas must submit to state regulation in order 
to call themselves seminaries. Specifically, section 61.313(a) 
provides:
 
Unless the 
institution has been issued a certificate of authority under this subchapter, a 
person may not: (1) use the term “college,” “university,” “seminary,” “school of 
medicine,” “medical school,” “health science center,” “school of law,” “law 
school,” or “law center” in the official name or title of a nonexempt private 
postsecondary educational institution; or (2) describe an institution using a 
term listed in Subdivision (1) or a term having a similar meaning.
 
 
Tex. Educ. Code § 61.313(a). To comply with 
this section of the Education Code, Tyndale must 
submit to twenty-one state-established standards. See id.; 19 Tex. Admin. Code § 7.7. 
Tyndale complains that such state regulation violates 
its rights under the Free Exercise Clause.
            
The State contends that its regulation of the term “seminary” is neutral and 
generally applicable, and thus permissible under Smith. I disagree. The 
State does not have the authority to determine whether a private postsecondary 
educational institution that professes a sincere faith may call itself a 
“seminary.” See Smith, 494 U.S. at 888; Hernandez v. Commissioner, 
490 U.S. 680, 699 (1989). Requiring 
religious organizations to submit to state regulation in order to call 
themselves seminaries is at odds with the Free Exercise Clause of the First 
Amendment of the United States Constitution.
            
The Board argued in its briefing that the term “seminary” is not an “exclusively 
religious” one, and the court of appeals apparently agreed. 114 S.W.3d at 633. The Board contended, citing Church v. 
Bullock, 109 S.W. 115, 117 (Tex. 1908), that a seminary is a “place of 
education” and only departs from this secular meaning when the adjectives 
“theological” or “religious” are placed in front of it to take on the meaning of 
“a place specifically for the preparation of men for the ministry, or at least, 
for the teaching of religious doctrines.” In postsubmission briefing, the Board acknowledged that 
“seminary” is a religious term but asserts that the term also conveys a secular 
meaning.
            
Statutory interpretation begins with the plain and common meaning of the 
statute’s words. McIntyre v. Ramirez, 109 S.W.3d 741, 
745 (Tex. 
2003). As enacted in 1975, section 61.313(a) only included the terms 
“college” and “university.” Act of May 28, 1975, 64th Leg., R.S., ch. 587, § 1, 1975 Tex. Gen. Laws 1867, 1870. The Legislature 
added the term “seminary” in 1997, along with the terms “school of medicine,” 
“medical school,” “health science center,” “school of law,” “law school,” and 
“law center.” Act of May 9, 1997, 75th Leg., R.S., ch. 
232, § 1, 1997 Tex. Gen. Laws 1147, 1149. If “seminary” has a 
predominantly secular meaning, as the Board contends, there is no reason for the 
Legislature to add it to the list of protected terms, as the addition would only 
repeat the statute’s reference to other secular educational institutions. We 
presume that each word in the statute has meaning and that the Legislature added 
seminary to the statute to include within the scope of the statute entities that 
were not covered by other terms. See Perkins v. State, 367 S.W.2d 140, 146 (Tex. 1963). The inclusion of “seminary” added 
religious institutions to the scope of the statute.
            
In addition, this Court has pondered the meaning of this word before. This Court 
reasoned in Bullock that
 
“[a] seminary is a place of education . . . specifically a 
school for the education of men for the priesthood or ministry.” A seminary 
being a “place of education,” the adjectives “theological or religious” 
necessarily give to it the meaning of a place specifically for the preparation 
of men for the ministry, or at least, for the teaching of religious doctrines. 
The words are commonly so used.
 
 
109 S.W. at 117 (quoting 25 Am. & Eng. Ency. Law, 286). In that case, this Court did not 
hold that it was only when combined with the words “religious” or “theological” 
that the word “seminary” took on the meaning proposed by HEB Ministries in this 
case. See id. “Seminary” has a primarily religious connotation, and when 
combined with the word “theological,” as in Tyndale 
Theological Seminary, it has an exclusively religious meaning.
            
The court of appeals relied, in part, on the definition of “seminary” given in 
Black’s Law Dictionary: “[a]n educational institution, such as a college, 
academy, or other school.” Black’s Law 
Dictionary 1392 (8th ed. 2004). Webster’s dictionary, however, defines 
the same term as “an institution for the training of candidates for the 
priesthood, ministry, or rabbinate.” Webster’s Third New International 
Dictionary 2064 (1961). Even the Board acknowledges that Tyndale’s avowed purpose is to train ministers to work in 
churches. In the context and usage of the statute, the word “seminary” included 
in the State’s statutory scheme refers to institutions that provide religious 
education, instruction, and training.
            
The United States Court of Appeals for the Fifth Circuit has held that, in some 
circumstances, a seminary qualifies as a “church” for purposes of the 
ministerial exception. EEOC v. Sw. Baptist Theological Seminary, 651 F.2d 277, 283 (5th 
Cir. 1981). In Southwestern Baptist, the court observed that the 
defendant seminary was an “integral part of a church, essential to the paramount 
function of training ministers who will continue the faith.” Id. The court also 
held that the seminary’s faculty qualified as “ministers” for purposes of the 
exception because the faculty members were “intermediaries between the [Southern 
Baptist] Convention and the future ministers of many local Baptist Churches.” 
Id. 
While seminarian policies and philosophies will differ among institutions, 
see, e.g., EEOC v. Miss. Coll., 626 F.2d 477, 479 (5th Cir. 
1990), Southwestern Baptist is instructive because it recognizes that 
seminaries often function similarly to churches or other organized 
congregations. The Board acknowledges that Tyndale’s 
purpose is to train ministers to work in churches. Furthermore, their faculty 
members may well be akin to church clergy in addition to providing general 
educational instruction on secular subjects.
            
I conclude, as does the Court, that the word “seminary” admits a primarily 
religious meaning, and now consider whether, consistent with the Free Exercise 
Clause, the State may dictate which institutions may call themselves 
seminaries.
            
The Supreme Court has espoused “a spirit of freedom for religious organizations, 
an independence from secular control or manipulation, in short, power to decide 
for themselves, free from state interference, matters of church government as 
well as those of faith and doctrine.” Kedroff v. St. Nicholas Cathedral of the Russian 
Orthodox Church in N. Am., 344 U.S. 94, 116 (1952) (declaring 
unconstitutional a state law that granted ownership of church property to the 
American branch of the Russian Orthodox Church). This “spirit of freedom” is 
reflected in many of the Court’s decisions regarding state interference in the 
internal affairs of churches and religious organizations. See, e.g., NLRB v. Catholic Bishop of Chicago, 440 
U.S. 490 (1979); Gonzalez v. Roman Catholic Archbishop of Manila, 280 
U.S. 1 (1929).
            
In 1929, the Supreme Court refused to decide whether an individual was qualified 
to be a chaplain in the Roman Catholic Church. Gonzalez, 280 
U.S. at 17. “Because the appointment 
is a canonical act, it is the function of the church authorities to determine 
what the essential qualifications of a chaplain are and whether the candidate 
possesses them.” Id.
            
In Catholic Bishop of Chicago, the Supreme Court considered whether 
church-operated schools were subject to the jurisdiction of the National Labor 
Relations Board (NLRB). 440 U.S. at 
491. Although the Court ultimately concluded that Congress did not intend 
to include church-operated schools within the purview of the National Labor 
Relations Act, the Court admonished that such an exercise of jurisdiction would 
raise “serious First Amendment questions” because the NLRB’s actions would “go 
beyond resolving factual issues.” Id. at 502, 504. They would
 
necessarily involve inquiry into the good-faith of the 
position asserted by the clergy-administrators and its relationship to the 
school’s religious mission. It is not only the conclusions that may be reached 
by the Board which may impinge on rights guaranteed by the Religion Clauses, but 
also the very process of inquiry leading to findings and conclusions.
 
 
Id.
            
To decide which institutions are seminaries and which are not, the Board 
necessarily would have to make judgments concerning which convictions, 
doctrines, and faiths are religious in nature and which are not. Because Tyndale is HEB Ministries’ training institution for 
ministries, the Board would have to consider whether the school is fulfilling 
its religious mission to the ministry and if its teachings are sufficiently 
“theological” in nature to be a seminary. For the government to determine 
whether sincerely professed religious beliefs are actually secular is an 
endeavor “fraught with the sort of entanglement that the Constitution forbids.” 
Hernandez, 490 U.S. at 697. This it cannot do. 
See Catholic Bishop of Chicago, 440 U.S. at 502. 
Once a person professes a sincere religious conviction or faith, the person’s 
right to her faith is protected by the Constitution and not subject to 
governmental determinations that they are not religious in nature. See 
id. The Board can no more prohibit a church from calling its school a 
seminary than it can prohibit a religious congregation from calling itself a 
church. HEB Ministries’ beliefs are protected by the Constitution from 
government regulation.
            
Because the term “seminary” admits of a primarily religious meaning, the State 
has no authority to prohibit Tyndale from using the 
term in its title, and may not constitutionally require private postsecondary 
institutions to submit to state regulation in order to do so. Accordingly, 
section 61.313(a) of the Texas Education Code is unconstitutional to the extent 
that it regulates this use of the term “seminary.”
            
The Court’s result is the same, but its reasoning is a bit different. It adds a 
distinction between religious institutions that teach a primarily religious 
curriculum and those which teach a secular curriculum. That distinction is 
unnecessary. In my view, a religious institution may teach the curriculum it 
desires, religious, secular, or mixed, and call itself a “seminary” without 
first submitting to state regulation.
B. State Regulation of Issuance of Degrees by a Religious 
Institution
            
Religious beliefs are immune from government regulation. See Cantwell v. 
Connecticut, 310 U.S. 296, 303 
(1940). Conduct motivated by religious beliefs also enjoys important 
constitutional protection. See 
Church of the Lukumi Babalu Aye, Inc. v. City of 
Hialeah, 508 U.S. 520, 531-33 
(1993). However, the Supreme Court has held that religiously motivated 
conduct is not always immune from state regulation. For example, states may ban 
the taking of controlled narcotics as a religious practice. Employment Div. v. Smith, 484 U.S. 872, 890 
(1990). Government prohibition of the religious practice of polygamy is 
not contrary to the constitutional right to religious freedom. Reynolds v. United 
States, 98 
U.S. 145, 164-66 (1879). The Amish are 
required, as are other employees, to pay social security taxes even though their 
faith precludes their participation in government support programs. United 
States v. Lee, 455 U.S. 
252, 258-61 (1982); see Cantwell, 310 U.S. at 303-04. 
And church-affiliated day care facilities generally are not exempt from 
compliance with regulations to protect the health and safety of the children in 
their care. State v. Corpus Christi People’s Baptist 
Church, 683 S.W.2d 692, 696-97 (Tex. 1984). To implicate religious Free 
Exercise Clause protections, the conduct at issue must be motivated by religious 
beliefs, which underlies the debate over whether placing “Ph.D.” at the top of 
graduation parchment is religiously motivated conduct. See Lukumi, 508 U.S. at 532.
            
The Supreme Court has developed different levels of scrutiny to apply to state 
regulations that burden religious conduct. Laws that target religious practices 
are subject to the most rigorous constitutional scrutiny under religion clause 
jurisprudence. Id. at 
533. Such state burdens must be narrowly tailored to satisfy a compelling 
governmental interest. Id.; Smith, 494 
U.S. at 878-79. Laws that 
substantially burden a person’s exercise of religion, even without expressly 
targeting religious practices for regulation, are likewise subject to strict 
scrutiny. Sherbert v. Verner, 374 U.S. 398, 402-03 (1963); Thomas v. Review 
Bd. of the Ind. Employment Sec. Div., 450 U.S. 707, 718 (1981) (“The state 
may justify an inroad on religious liberty by showing that it is the least 
restrictive means of achieving some compelling state interest.”); Hobbie v. Unemployment Appeals Comm’n of Fla., 480 U.S. 136, 141 (1987) (“The Appeals 
Commission does not seriously contend that its denial of benefits can withstand 
strict scrutiny; rather it urges that we hold that its justification should be 
determined under the less rigorous standard . . . . We reject the argument again 
today.”). State action that does not target religion or substantially burden 
religious conduct but only incidentally burdens religious practices may pass 
constitutional muster if it is otherwise valid and does not impact religion 
disparately, i.e., the laws are neutral and generally applicable. Smith, 
494 U.S. at 878 (“[I]f prohibiting the exercise of religion . . . is not the 
object of the tax but merely the incidental effect of a generally applicable and 
otherwise valid provision, the First Amendment has not been offended.”). The 
Supreme Court rejected the argument that neutral and generally applicable laws 
that incidentally burden religious practices are subject to strict scrutiny and 
suggested that a reasonable relationship test determines whether they are 
constitutional. See id. at 885-86 & n.3.
            
The Supreme Court established these standards in several cases over the years. 
Although the opinions have been the subject of an active discussion in legal 
publications, the Supreme Court’s pronouncements are binding until changed. 
See Kathleen A. Brady, Religious Organizations and Free Exercise: The 
Surprising Lessons of Smith, 2004 BYU L. Rev. 1633 (2004); Christopher L. 
Eisgruber & Lawrence G. Sager, The 
Vulnerability of Conscience: The Constitutional Basis for Protecting Religious 
Conduct, 61 U. Chi. L. Rev. 
1245 (1994); Douglas Laycock, Formal, Substantive, and Disaggregated 
Neutrality Toward Religion, 39 DePaul L. Rev. 993 (1990); Douglas 
Laycock, The Supreme Court and Religious Liberty, 40 Cath. Law. 25 (2000); Michael W. 
McConnell, Free Exercise Revisionism and the Smith Decision, 57 
U. Chi. L. Rev. 1109 (1990); 
Michael W. McConnell & Richard A. Posner, An Economic Approach to Issues 
of Religious Freedom, 56 U. Chi. L. 
Rev. 1 (1989). In the seminal case of Sherbert v. Verner, 
the Supreme Court held that a substantial burden on the exercise of religious 
beliefs is subject to strict scrutiny. 374 U.S. 398, 402-03 
(1963). A member of the Seventh-day Adventist Church quit employment that 
required her to work on her Saturday sabbath, and was 
subsequently denied unemployment benefits for declining without “good cause” to 
accept other employment that also required work on Saturday. Id. at 
406. The Court framed the issue as “whether some compelling state 
interest enforced in the eligibility provisions of the . . . statute justifies 
the substantial infringement of the appellant’s First Amendment right.” 
Id. 
Finding no compelling governmental interest at issue, 
the Court held that the denial of unemployment benefits violated the plaintiff’s 
free-exercise rights. Id. at 406-07; 
see Thomas, 450 U.S. at 718.
            
In 1990, the Supreme Court addressed an incidental rather than substantial 
infringement on religious conduct. Explicitly addressing for the first time 
religious conduct restricted by a state criminal law of general applicability, 
the Supreme Court in Smith applied a lower standard to the constitutional 
challenge in that case than it did in Sherbert. 
494 U.S. at 885-86. Two members of 
the Native American Church brought a free exercise challenge to an 
Oregon law 
criminalizing the “knowing or intentional possession of a ‘controlled substance’ 
unless the substance has been prescribed by a medical practitioner.” Id. at 874 
(referring to Ore. Rev. Stat. § 475.992(4) (1987)). The 
plaintiffs were discharged from their jobs for ingesting peyote, a “controlled 
substance” under Oregon law, for sacramental purposes during a 
Native American Church ceremony. Id. They claimed the Oregon law was 
unconstitutional as applied to them because it interfered with their exercise of 
religion. Id.
            
The Court reaffirmed that “first and foremost” the Free Exercise Clause means 
“the right to believe and profess whatever religious doctrine one desires,” and 
precludes “all ‘governmental regulation of religious beliefs as such.’” 
Id. at 877 (quoting Sherbert, 374 
U.S. at 402). Distinguishing 
the regulation of religious beliefs from the regulation of conduct, the Court 
observed that it has “never held that an individual’s religious beliefs excuse 
him from compliance with an otherwise valid law prohibiting conduct that the 
State is free to regulate.” Id. at 
878-79. The right of free exercise “does not relieve an individual of the 
obligation to comply with a ‘valid and neutral law of general applicability on 
the ground that the law proscribes (or prescribes) conduct that his religion 
prescribes (or proscribes).’” Id. at 879 
(quoting Lee, 455 U.S. at 263 
n.3). To require strict scrutiny of the criminal statute in the case 
“would produce . . . a private right to ignore generally applicable laws . . . 
[which] is a constitutional anomaly.” Id. at 886. The Court held that neither the text of the 
Constitution nor Court precedent require that states allow use of a controlled 
substance as a religious practice. Id. at 887-88.
            
The Court expressly declined to extend the strict scrutiny balancing test of 
Sherbert to govern “the analysis of generally 
applicable prohibitions of socially harmful conduct.” Id. at 
889-90. Thus, the state need not establish a compelling interest to 
institute incidental burdens on a person’s religious practices, so long as it 
does so through a neutral and generally-applicable criminal law that does not 
otherwise violate the Constitution. Id.[8]
            
The Court affirmed the holding in Smith three years later in Lukumi, 508 U.S. 520. Lukumi involved a set of city ordinances that 
prohibited the religious sacrifice of animals by the Santeria religion and 
imposed criminal sanctions for their violation. Id. at 525-28. The Court reaffirmed “the general proposition 
that a law that is neutral and of general applicability” and only 
incidentally burdens religious practices need not be narrowly tailored to 
advance a compelling government interest. Id. at 531-32. The city ordinances at issue were held 
unconstitutional, however, because they were neither neutral nor generally 
applicable but targeted the religious practices of the Santeria religion. 
Id. at 541, 
545-46.
            
In Lukumi, the Court observed that “if the 
object of a law is to infringe upon or restrict practices because of their 
religious motivation, the law is not neutral.” Id. at 533. Although passing facial review, the laws in question 
were not neutral because Santeria worship was the “object” or “target” of the 
city’s ordinances. Id. at 
534-40. The Court determined that the “design” of the laws accomplished 
“a religious gerrymander, an impermissible attempt to target petitioners and 
their religious practices.” Id. at 535 
(citation omitted).
            
Addressing the “general applicability” requirement, the Lukumi 
Court observed that “government, in pursuit of 
legitimate interests, cannot in a selective manner impose burdens only on 
conduct motivated by religious belief” and that this principle “is essential to 
the protection of the rights guaranteed by the Free Exercise Clause.” Id. at 
543. Although the Court did not define the standard for general 
applicability, the Court held that “these ordinances fall well below the minimum 
standard necessary to protect First Amendment rights.” Id. In arriving at 
this conclusion, the Court observed that the ordinances were vastly underinclusive and included many secular exemptions. 
Id. at 
543-46. Failing both the neutrality and general applicability prongs, the 
Lukumi Court applied “the 
most rigorous of scrutiny” to the City of Hialeah’s ordinances and held them 
unconstitutional because they were “designed to persecute or oppress a 
religion.” Id. at 
547.
            
The parties disagree which level of scrutiny should apply to section 61.304 of 
the Education Code. HEB Ministries contends that because the State’s regulatory 
scheme provides for secular exemptions, but not religious ones, it is not 
neutral and, accordingly, the statutory scheme must be analyzed under strict 
scrutiny. See Lukumi, 508 U.S. at 537, 543-46; see also Fraternal Order 
of Police Newark Lodge No. 12 v. City of 
Newark, 170 
F.3d 359, 363 (3d Cir. 1999). Specifically, HEB 
Ministries points to section 61.303 of the Education Code, which exempts 
some institutions from being required to have a Board-issued certificate of 
authority if they have been accredited by a state approved accrediting agency. 
HEB also cites section 61.313, which exempts some educational institutions from 
the prohibition on protected terms if they used the terms “college” or 
“university” in their title prior to September 1, 1975. Tex. Educ. Code §§ 61.303, 61.313. HEB 
Ministries further contends strict scrutiny applies because this is a hybrid 
rights case involving multiple constitutional claims, including claims based on 
the Free Speech Clause, Free Exercise Clause, and Establishment Clause. See 
Smith, 494 U.S. at 881.
            
The State contends that section 61.304 is neutral and generally applicable, and 
therefore under Smith, this Court must not apply the Sherbert strict scrutiny analysis. According to the 
State, the laws at issue apply to all private postsecondary educational 
institutions—religious and secular alike—that grant postsecondary academic 
degrees. The State also contends there is no evidence that the object of the 
statutory scheme was to infringe upon or restrict practices because of their 
religious motivation or to suppress religious beliefs.
            
As explained in Lukumi, the beginning point is 
the statute’s text, for the minimum requirement of neutrality is that a law not discriminate on its face. Lukumi, 508 U.S. at 533. A law lacks facial 
neutrality if it refers to a religious practice without a secular meaning 
discernable from the language or context. Id. A facial reference to religion in a 
statute does not necessarily render it presumptively unconstitutional, see 
Locke v. Davey, 540 U.S. 712, 725 (2004), nor is facial 
neutrality alone determinative. Lukumi, 508 
U.S. at 533-34. The Free Exercise 
Clause, like the Establishment Clause, “forbids subtle departures from 
neutrality,” Gillette v. United States, 401 U.S. 437, 452 
(1971), and covert suppression of particular religious beliefs. Bowen v. Roy, 476 U.S. 693, 703 (1986) (opinion of 
Burger, C.J.). Official action that targets religious conduct for 
distinctive treatment cannot be shielded by mere compliance with the requirement 
of facial neutrality. “The Court must survey meticulously the circumstances of 
governmental categories to eliminate, as it were, religious gerrymanders.” Walz v. Tax Comm’n, 
397 U.S. 664, 696 (1970) 
(Harlan, J., concurring); see Lukumi, 508 
U.S. at 534.
            
According to Tyndale, section 61.304 is 
unconstitutional because it forces Tyndale to submit 
to the State’s regulations in order to award college degrees to describe the 
educational attainment of its students. See Nat’l Labor Relations Bd. v. 
Catholic Bishop of Chicago, 440 U.S. 490, 502 (1979). Section 61.304 
precludes private postsecondary institutions from awarding degrees unless the 
Board has issued the institution a certificate of authority, and to obtain such 
a certificate requires submission to the twenty-one standards governing 
curriculum, faculty, and school governance. Tex. Educ. Code § 61.304.
            
The Legislature explained its purposes for enacting these requirements for 
private postsecondary education institutions. “It is the policy and purpose of 
the State of Texas to prevent deception of the public 
resulting from the conferring and use of fraudulent or substandard college and 
university degrees . . . .” Id. § 
61.301. The Legislature also explained:
 
Because 
degrees and equivalent indicators of educational attainment are used by 
employers in judging the training of prospective employees, by public and 
private professional groups in determining qualifications for admission to and 
continuance of practice, and by the general public in assessing the competence 
of persons engaged in a wide range of activities necessary to the general 
welfare, regulation by law of the evidences of college and university 
educational attainment is in the public interest. To the same end the protection 
of legitimate institutions and of those holding degrees from them is also in the 
public interest.
 
 
Id.
            
This Court recognized recently, quoting Brown v. Board of Education, 347 
U.S. 483, 493 (1954), that “education 
is perhaps the most important function of state and local governments.” Neely 
v. West Orange-Cove Consol. Indep. Sch. Dist., 176 S.W.3d 746, 799 (Tex. 
2005). The United States Supreme Court held that Congress’ 
stated purpose in enacting the Higher Education Act of assisting colleges in 
ensuring that large numbers of youth obtain educations is a “legitimate secular 
objective entirely appropriate for governmental action.” Tilton v. Richardson, 403 U.S. 672, 679 
(1971). The Supreme Court further explained that “[t]here is no doubt as 
to the power of a State, having high responsibility for education for its 
citizens, to impose reasonable regulations for the control” of education. 
Wisconsin v. Yoder, 406 U.S. 205, 213 (1972); see also Lemon v. Kurtzman, 403 U.S. 602 (1971); Pierce v. Soc’y of Sisters, 268 U.S. 510, 534 
(1925). And the New Jersey Supreme Court held that the privilege of granting 
degrees, evidential of academic achievement, is “very intimately related to the 
public welfare, and is unquestionably subject to regulation by the State.” 
Shelton Coll. v. State Bd. of Educ., 226 A.2d 
612, 618 (N.J. 1967) (quoting Elliott, 
The Colleges and the Courts 200 (1936)). The purpose of ensuring the 
quality of postsecondary education provided by institutions in this State and 
protecting the integrity of college degrees issued therefrom is plainly within the State’s substantial interest 
in education.
            
The Legislature’s objective is to ensure that the granting of a degree is a 
meaningful act grounded in established curricular and instructional standards 
and that persons who rely on a postsecondary degree, lawfully issued by a 
Texas 
institution, may accurately presume a level of competence and qualification. 
See Tex. Educ. 
Code § 61.301. The 
Legislature enforces this objective in education, an area in which it has a 
substantial and legitimate interest. See Yoder, 406 U.S. at 213; 
Neely, 176 S.W.3d at 753. Moreover, all postsecondary institutions, 
whether secular or religious, private or public, must submit to the State’s 
standards to grant college or graduate degrees. See Tex. Educ. Code §§ 61.0512, 61.304; 19 Tex. Admin. Code § 7.7(13) (requiring certain degree 
programs at private postsecondary institutions to include “Humanities and Fine 
Arts, Social and Behavioral Sciences, and Natural Sciences and Mathematics” as 
well as “courses to develop skills in written and oral communication”). An 
institution may operate outside those standards if it chooses to use 
nomenclature on its graduation documents other than college or graduate degrees 
(e.g., bachelor’s level certificate), but to issue degrees it must comply with 
public standards. There is no disparate treatment of any category of 
institutions.
            
The law here is neutral and generally applicable and prohibits the unauthorized 
issuance of college and graduate degrees, currently enforced by both civil and 
criminal penalties. The Supreme Court held in Smith that individuals must 
comply with valid laws prohibiting conduct that the State is free to regulate. 
494 U.S. at 878-79. In this case, 
I do not believe the Constitution bans states from promulgating generally 
applicable standards that must be met before postsecondary institutions may 
confer degrees on its students.[9]
            
The Office of the Attorney General for the State of Texas has opined on this 
very issue: whether rights under the Free Exercise Clause permit a religious 
organization to operate a degree-awarding university without compliance with 
state standards. Op. Tex. Att’y Gen. No. JC-0200 
(2000). Attorney General John Cornyn concluded 
that “the application to religious educational institutions of state laws 
regulating the awarding of degrees does not violate the law restricting 
governmental burdens on the free exercise of religion. Id.[10]
            
The only other state supreme court to address this 
issue also reached the same outcome. The Tennessee Supreme Court held that the 
Tennessee Postsecondary Education Authorization Act’s prohibition on the 
issuance of degrees by postsecondary institutions, unless they complied with 
state standards, did not violate the Free Exercise Clause of the First 
Amendment. McLemore v. Clarksville Sch. of Theology, 
636 S.W.2d 706 (Tenn. 1982). It held that the granting 
of degrees is “unquestionably subject to regulation by the State” and is not a 
religious activity. 636 S.W.2d at 709; see Shelton Coll. v. State Bd. of 
Educ., 226 A.2d 612 (N.J. 1967) (rejecting a claim 
that the First Amendment right of free speech prohibited the state from 
regulating the power to confer a bachelor’s degree).
            
To the extent an institution desires to enter into this sphere of legitimate 
state regulation—e.g., the granting of college, university, and graduate degrees 
by private postsecondary educational institutions—it must comply with state 
mandates that are not unnecessarily intrusive and are prompted by legitimate 
objectives. See Smith, 494 U.S. at 878-79; Lee, 455 
U.S. 252, 261 (1982). A contrary 
conclusion would allow entities, regardless of their motives, to circumvent the 
statutory requirements under the guise of religious practices by issuing degrees 
supported by little or no meaningful educational attainment. This would 
undermine the legitimate objectives of precluding issuance of fraudulent degrees 
and ensuring that society could rely on the attainment of a college degree as 
evidence of meaningful postsecondary educational accomplishment.
            
Because in this case Tyndale is engaging in commercial 
conduct the State is free to regulate—the granting of educational “degrees,” 
“associate degrees,” “bachelor’s degrees,” “master’s degrees,” and “doctorate 
degrees,”—I conclude that section 61.304 of the Education Code does not offend 
the Free Exercise Clause of the United States Constitution. See id. at 878-79; Lukumi, 508 
U.S. at 531-33.
            
The plurality concludes that Tyndale has a 
constitutional right to issue college and graduate degrees without compliance 
with the Legislature’s standards. Of course, Tyndale 
does not frame its case in this fashion because the idea in this context that 
only one type of postsecondary institution, a seminary, has an unfettered 
constitutional right to put the title “college degree” at the top of its 
graduation documents, without regard to compliance with public standards, is a 
tenuous notion. Instead, Tyndale enmeshes its argument 
on this issue with the bedrock principle that the State cannot regulate the 
doctrinal beliefs and teachings of a church’s school. Wrapped in this 
theological flag, Tyndale’s arguments then focus on 
religious beliefs and bury the real issue of the appropriate words to title a 
graduation document beneath it. I disagree that the Constitution bars the 
Legislature from establishing generally applicable standards for the granting of 
postsecondary educational degrees. This question concerns conduct—whether Tyndale can put “college degree,” with no disclaimer or 
explanation that it does not comply with public standards at the top of its 
graduation documents. No one, including the Board, disputes Tyndale’s right to believe and teach whatever it chooses and 
hire whomever it desires to do so.
            
Of course, it sounds patently offensive to religious freedoms to assert that the 
State is barring Mother Teresa and Reverend Billy Graham from teaching at a 
seminary, and if correct, it would be. But doctrine and instruction are not 
tantamount to stamping a title on a piece of parchment handed out at graduation. 
Governments cannot regulate what a seminary teaches, who it hires to teach, or 
how its administration is structured. These matters are central to the 
seminary’s beliefs and convictions, and the freedom to believe as one chooses is 
absolute. See Braunfeld v. Brown, 366 
U.S. 599, 603 (1961). Typing the 
letters “Ph.D.” on a parchment is an act that is not inherent to Tyndale’s religious beliefs or engaged in for religious 
reasons, and should not be accorded constitutional protection under the religion 
clauses. See Smith, 494 U.S. at 877. The Legislature could 
decide to allow it, but the Constitution does not require it. The plurality 
strains to persuade that because the Board does not allow Tyndale to confer degrees without compliance with the 
statutes, that it is dictating the doctrine that may be taught at the seminary. 
I remain unconvinced.[11] Tyndale, 
however, is correct that it should be able to use meaningful designations on 
“official looking paper” to convey what it believes to be substantial 
educational achievement. (See infra, Section III). This does not require, 
as the plurality concludes, creation of a constitutional right of religious, but 
not non-religious, postsecondary institutions to issue college and graduate 
degrees. Although different from this case, the plurality’s reasoning would 
grant a constitutional right to a religious group to confer a doctor of 
philosophy degree on a graduation parchment after providing an hour of 
instruction.
            
The Education Code’s broad definition of the term “degree” precludes use of many 
words similar to “degree.” Tyndale asserts that 
section 61.304 of the Education Code, by virtue of the definition of “degree” in 
61.302(1), regulates virtually all useful terminology that it may use to convey 
the educational achievement of its students. Although I believe that the 
granting of degrees is conduct the Legislature may regulate, the State’s attempt 
to regulate Tyndale’s use of any language suggesting a 
similar or competing level of educational competency also must be valid under 
the Free Speech Clause of the First Amendment.
III
Free Speech
            
HEB Ministries contends that the State’s regulatory scheme violates its rights 
to free speech under the First Amendment of the United States Constitution 
because the State has usurped virtually all terms it could reasonably use to 
describe the educational achievement of its students. See U.S. Const. amend. I, cl. 3 (“Congress shall 
make no law . . . abridging the freedom of speech . . . .”); Tex. Const. art. I, § 8 (“Every person 
shall be at liberty to speak, write or publish his opinions on any subject, 
being responsible for the abuse of that privilege; and no law shall ever be 
passed curtailing the liberty of speech or of the press.”). The State, in 
contrast, asserts that the speech at issue is commercial speech and, pursuant to 
federal constitutional law, the State has a substantial interest in curtailing 
the proliferation of diploma mills and assuring that indicia of educational 
attainment are accurate, and that the challenged statutes directly advance that 
governmental interest. HEB contends that, even if the speech at issue is 
commercial, the State must still show that the speech restrictions are narrowly 
drawn to serve that substantial interest. Tyndale’s 
contention is that the State’s regulation of any title, word, appellation, and 
other terminology not only “equivalent” to degree but suggesting a course of 
study toward a postsecondary degree or “its equivalent” is an unconstitutionally 
broad prohibition on Tyndale’s free-speech rights.
            
The court of appeals agreed with the State that its regulation of the terms 
“degree,” “associate,” “bachelor,” “master,” “doctor,” and other “equivalents” 
in sections 61.304 and 61.302(1) targets commercial speech. 114 S.W.3d at 631-32. The Supreme Court’s case law confirms 
that determination. Commercial speech is speech that seeks to propose a 
commercial transaction or is expression that serves the economic interests of 
the speaker. Bd. of Trs. v. Fox, 492 
U.S. 469, 473 (1989); Bolger v. 
Youngs Drug Prods. Corp., 463 U.S. 60, 64 (1983); 
Cent. Hudson Gas & Elec. Corp. v. 
Pub. Serv. Comm’n, 
447 U.S. 557, 561 (1980); 
Va. State Bd. of Pharmacy v. Va. Citizens Consumer 
Council, Inc., 425 U.S. 748, 762 
(1976). The First Amendment’s protection of commercial speech 
is based on advertising’s informational function, which equips persons to act in 
their own best interests. Cent. Hudson, 
447 U.S. at 562-63. To help fulfill this 
goal, there is a “constitutional presumption favoring disclosure over 
concealment,” because “disclosure of truthful, relevant information is more 
likely to make a positive contribution to decisionmaking than is concealment of such information.” 
Peel v. Attorney Registration & Disciplinary Comm’n, 496 U.S. 91, 108, 111 (1990); see Ibanez v. 
Fla. Dept. of 
Bus. & Prof’l Regulation, 512 U.S. 136, 142 
(1994). The First Amendment presumes that some accurate 
information is better than no information at all. Cent. Hudson, 447 U.S. at 562. On 
this basis, the Supreme Court held that use of the designations CPA (certified 
public accountant) and CFP (certified financial planner) are commercial speech. 
Ibanez, 512 U.S. at 143-44. The terms “Dr.” and 
“Ph.D.” have also been held to be commercial speech. Strang v. Satz, 884 F. Supp. 504, 507 (S.D. Fla. 1995). The 
title “M.D.” has also been analyzed under the commercial speech doctrine. State ex rel. State Bd. of Healing Arts v. Thomas, 
97 P.3d 512, 523-24 (Kan. Ct. App. 2004). The conferral of degrees is 
largely a commercial activity and a privilege granted to institutions by the 
states in which they operate. See Nova Univ. v. Educ. Inst. Licensure Comm’n, 
483 A.2d 1172, 1181 (D.C. 1984) (“degree conferral is business conduct, a 
corporate privilege conferred by the state of incorporation,” and accordingly, 
“[e]ducational institutions have no inherent or 
constitutional right to confer degrees”). Courts have treated the display of 
terms such as “fellow,” “associate fellow,” “board certified,” “certified,” and 
“specialist” as commercial speech. See Borgner v. Brooks, 284 F.3d 1204, 1207, 1210 
(11th Cir. 2002) (relying upon the Eleventh Circuit’s treatment of the title 
“psychologist” in Abramson v. Gonzalez, 949 F.2d 1567, 1574-75 (11th Cir. 
1992)); Potts v. Hamilton, 334 F. Supp. 2d 1206, 1209, 1213-15 (E.D. Cal. 
2004); Bingham v. Hamilton, 100 F. Supp. 2d 1233, 1234-35, 1239 (E.D. 
Cal. 2000) (all three cases involve statutes prohibiting dentists, who 
specialize in implant dentistry and are certified by organizations not 
recognized by the state, from advertizing certain 
credentials).
            
Tyndale provides educational and ministerial training 
courses to its students and the students pay tuition and fees. Tyndale’s conferral of titles on its graduating students and 
advertisement of information about degrees it awards to graduating students is 
commercial speech.
            
Restrictions on commercial speech are reviewed under the test established in 
Central Hudson, 447 U.S. 557. The Constitution “accords a 
lesser protection to commercial speech than to other constitutionally guaranteed 
expression.” Id. at 
563. The State may ban commercial speech which concerns unlawful activity 
or is false, deceptive, and misleading. Ibanez, 512 
U.S. at 142; Cent. 
Hudson, 447 U.S. at 566. Otherwise, commercial 
speech may not be restricted unless 1) the government has a substantial interest 
in restricting the speech, 2) the regulation directly advances the asserted 
governmental interest, and 3) the speech restrictions are narrowly drawn such 
that they are no more extensive than necessary to serve that interest. Cent. Hudson, 447 U.S. at 566. The 
Court clarified in Fox, 492 U.S. at 480, that the requirement of 
narrowly constructing the restriction does not compel the state to employ the 
restriction that is “absolutely the least severe that will achieve the desired 
end.” The law requires that the restriction of commercial speech be in 
proportion to the interest served. Id. The proponent of the restriction on 
commercial speech carries the burden of justifying it. Edenfield v. Fane, 507 
U.S. 761, 770 (1993).
            
The parties do not dispute that the speech at issue concerns lawful activity and 
the Board does not contend that the expression is false. The State contends only 
that it seeks to regulate Tyndale’s potentially 
deceptive speech. As previously observed, the State’s interest in ensuring the 
quality of postsecondary educational institutions that issue degrees in this 
state is substantial. And Tyndale does not contest 
that the State has a substantial interest in regulating private postsecondary 
education, or that the State may endeavor to assure that degrees accurately 
portray educational attainment and to prevent the operation of illegal diploma 
mills. I consider the other two prongs of the test for permissible regulation of 
commercial speech and determine whether sections 61.304 and 61.302(1) of the 
Education Code directly advance the State’s interest, and whether narrower 
limitations could be crafted to ensure the potentially misleading information is 
presented in a nonmisleading manner.
            
Restricting an unaccredited institution’s ability to award degrees directly 
advances the State’s interest because
 
degrees and equivalent indicators of educational attainment 
are used by employers in judging the training of prospective employees, by 
public and private professional groups in determining qualifications for 
admission to and continuance of practice, and by the general public in assessing 
the competence of persons engaged in a wide range of activities necessary to the 
general welfare.
 
 
Tex. Educ. Code § 61.301. The Legislature may 
also address conduct that attempts to accomplish indirectly that which is 
prohibited directly in the statute. Thus, for example, the State may preclude an 
institution that does not meet its standards from lawfully calling its 
graduation documents master’s degrees yet representing through other means that 
“certificates” it issues have complied with the State’s educational standards 
for a master’s degree.
            
Tyndale responds that the State’s nearly complete 
usurpation of reasonable terms to describe postsecondary educational attainment 
is not tailored to directly serve the State’s objectives. Unless certified by 
the Board, the statute bars a postsecondary institution’s use of “any 
title or designation, mark, abbreviation, appellation, or series of letters or 
words, including associate, bachelor’s, master’s, 
doctor’s, and their equivalents” to describe private postsecondary 
achievement which leads to a degree or partially fulfills a degree program “or 
its equivalent.” Id. § 61.302(1) (emphasis added). The 
State responds that HEB could issue “certificates,” “advanced certificates,” 
“diplomas,” or “higher diplomas” so long as it refrains from describing them as 
equivalent to an associate’s, bachelor’s, master’s, or 
doctor’s degree. The State also contends that the statutes are narrowly tailored 
because HEB Ministries is still free to advertize its 
qualifications, services, and missions, so long as it does not use the protected 
terms—degree, associate, bachelor’s, master’s, and doctor’s—that suggest 
approval by the State and satisfaction of minimum educational standards that 
society has come to expect of these terms. The State also argues the statutes 
are narrowly tailored because Tyndale could not be 
fined for, and would not be prohibited from issuing, for example, a “diploma” or 
“certificate” because these terms by themselves do not signify, purport to 
signify, and are not generally taken to mean “a program of study leading to an 
associate, bachelor’s, master’s, or doctor’s degree or its equivalent.”[12] See id.
            
A plain reading of the statute conveys a much broader prohibition than the Board 
concedes. First, under the statute a “degree” includes the protected terms 
associate, bachelor’s, master’s, doctor’s and degree. Id. Generally, the 
definition requires that for protected words or titles to trigger state 
regulation, they be described or perceived as leading to a degree at the 
associate, bachelor’s, master’s or doctorate level.
            
The Board asserts that an institution must be certified to use any of these 
protected terms by themselves because they suggest and are generally understood 
to indicate that a recipient completed part or all of a program leading to a 
degree. The statutory language indeed extends that broadly. Second, the statute 
also defines a “degree” to include any word, title, designation, series of 
letters, or similar terminology to the protected terms that suggest study toward 
a state-recognized degree. Further extending the scope of the statute, the 
Legislature barred use of “any title,” “designation,” “words,” “mark,” “series 
of letters,” or “appellation” that conveys study leading to a degree, or any 
similar posteducational achievement. Id. The language 
of 61.302(1) encompasses virtually every term that could reasonably provide a 
useful description of educational achievement at a postsecondary educational 
institutional. The legislation bans unapproved programs from using any of the 
protected terms, any words, letters, or titles that are similar to the protected 
terms and any words that suggest a program leading to a college or graduate 
degree or any words that are similar to the titled programs. The language of 
section 61.302(1) supports the Board’s fines for use of the word “diploma” and 
“certificate” and provides a basis for fining unaccredited institutions for 
using the phrases “bachelor’s level diploma” and “comparable to an associate’s 
degree.” The statute impermissibly bars Tyndale from 
issuing a master’s level certificate or an associate’s level diploma, terms 
which do not convey state certification of a degree, but do convey postsecondary 
education accomplishment. A majority of the Court decides that for religious 
instruction by religious schools, the regulation of educational terminology 
under the statute’s broad definition of degree violates constitutional 
standards. ____ S.W.3d ____. (In Section III.C., the 
plurality states that “the use of any words remotely resembling ordinary 
education terms is risky”).[13] The appellations that the public 
understands to indicate college and graduate level study would all be equivalent 
or similar to the protected terms and “their equivalents.”
            
The Board’s concession that Tyndale may use 
“certificate” or “diploma” on its graduation documents without state approval is 
not helpful. Under the statute, the words “diploma” and “certificate” certainly 
are “titles,” “words,” or “appellations” and they are similar to the protected 
term “degree.” Thus, by its terms the statute bars any use of “diploma” and 
“certificate” that may indicate completion of all or part of a program leading 
to a degree. However, even if the Board’s concession is correct under the 
language of the statute, the concession is not useful without being able to tie 
the terms “diploma” or “certificate” to some description of a recognized or 
similar level of postsecondary educational attainment, and the statute precludes 
making that connection. For example, Tyndale could 
likely issue a “diploma of theological studies” which would not convey its 
apparent belief that its program is comparable to college level course work 
because diplomas generally are issued at the high school educational level. 
See Brief for Independent Colleges and Universities of Texas, Inc. 
as Amicus Curiae at 12-13 (explaining that there is a public perception that a 
degree qualifies an individual to perform in their chosen field of study.)[14] If Tyndale 
issued a “diploma of bachelor’s level studies”, which would more accurately 
convey its contentions about its program, that title would violate the statute. 
The Board concedes the use of terms that would not allow Tyndale to accurately describe its belief about the level or 
quality of it programs. The Board’s concession does not resolve the free speech 
problems Tyndale raises.
            
Section 61.302(1)’s prohibitions on First Amendment expression further preclude 
private postsecondary educational institutions from advertising comparisons with 
state-certified institutions. For example, the Board objects to Tyndale’s description of its Diploma of Theological Studies 
as “stronger . . . than the typical Bachelors in Biblical Studies.” Such a 
description suggests that Tyndale’s program is better 
than state-certified Bachelor’s Degree programs.[15] Fining private institutions for making 
legitimate comparisons that their programs are similar to or better than 
state-certified programs leading to a degree does not equip persons to act in 
their own interests. Instead, it punishes institutions for disclosure of 
truthful, relevant information that is likely to make a positive contribution to 
decision making. See Peel, 496 U.S. at 108; Cent. Hudson, 447 
U.S. at 567-68. This restriction 
contradicts the First Amendment’s purpose for commercial speech.
            
Moreover, the applicable portions of sections 61.304 and 61.302(1) operate as a 
ban on not only potentially misleading speech but also on truthful speech. Tyndale issued diplomas and certificates which may be as 
good as or better than some state-certified programs, and other private 
institutions, whether religious or nonreligious, would have the same complaint 
that legitimate comparisons are being improperly silenced. The regulation is 
more extensive than necessary to serve the State’s legitimate interests. Under 
61.302(1), Tyndale cannot use any terms that are 
similar to the protected terms, and it cannot describe its programs as similar 
to or better than state-approved programs leading to a 
degree. The statute cuts an impermissibly broad swath through protected 
commercial speech.
            
As previously stated, the standard for judging restrictions on commercial speech 
is that the restriction be in proportion to the interest served. Fox, 492 
U.S. at 480. The availability of more 
limited alternatives that are less restrictive of speech is strong support for a 
conclusion that the regulation does not directly advance the desired goal. Thompson v. W. States Med. Ctr., 535 U.S. 357, 371 
(2002). The Supreme Court’s analysis indicates that courts should inquire 
whether the government could achieve its interests in a manner that does not 
restrict speech or is less restrictive of commercial speech. Id. The answer to 
this inquiry will help illuminate whether the regulation directly advances the 
governmental interest and is more extensive than necessary to serve that 
interest. Id. at 371, 373 (noting that “we have made clear that if the 
Government could achieve its interests in a manner that does not restrict 
speech, or that restricts less speech, the Government must do so” and that even 
with commercial speech, “regulating speech must be a last—not first—resort.”). 

            
Tyndale notes that narrower limitations could achieve 
the Legislature’s desired objectives by requiring, for example, reasonable 
disclaimers or disclosures that certificates and diplomas Tyndale may issue are not approved by the State and that 
Tyndale itself is not accredited by the State. The 
Supreme Court has recognized “the possibility that some limited supplementation, 
by way of warning or disclaimer or the like, might be 
required” rather than a ban on commercial speech. Bates, 433 U.S. at 384; see, e.g., Peel, 496 
U.S. at 110 (providing similar 
disclosure examples); Cent. Hudson, 447 U.S. at 570 
(holding the state’s interest could be addressed by including accurate 
descriptive information rather than banning the speech); Strang, 884 F. Supp. at 510 (holding the same with 
respect to statute that prohibited use of “Ph.D.” or the title “doctor” unless 
obtained from an institution recognized by the state). Such measures may achieve 
the State’s desired objective and be more likely to provide useful and accurate 
information to contribute to the public’s decisionmaking than would banning 
all such information from the institution. See Ibanez, 512 
U.S. at 142.[16] In the present context, reasonable 
disclaimers regarding the theological certificates and diplomas could serve to 
better inform the public of Tyndale’s students’ 
educational achievements than would a complete ban on their ability to 
accurately describe such achievements. The Education Code currently includes 
such a disclosure for the granting of honorary degrees. Tex. Educ. Code § 61.312. Thus, I conclude 
the State has not carried its burden of showing that its regulation of this 
commercial speech directly advances its interest because the regulation is more 
extensive than necessary to serve the Legislature’s legitimate purposes. See 
Cent. Hudson, 447 U.S. at 570.
IV
Conclusion
            
Accordingly, I would reverse the court of appeals judgment and vacate the fines 
assessed by The Texas Higher Education Coordinating Board against HEB 
Ministries.
 
 
                                                                        
________________________________________
                                                                        
J. Dale Wainwright
                                                                        
Justice
 
OPINION 
DELIVERED: August 31, 2007






[1] 
HEB Ministries is unrelated to the H.E. Butt Grocery Company, which is also 
commonly referred to as “HEB.”

[2] 
Because their interests are aligned, I use the terms “HEB” and “Tyndale” interchangeably.

[3] 
Section 61.313(a)(1) prohibits a private postsecondary educational institution 
from using the term “seminary” in its official name unless the entity first 
obtains a certificate of authority from the Board or becomes accredited by a 
state-approved accrediting agency. Tex. 
Educ. Code § 61.313(a)(1); see also id. § 
61.303(a) (exempting accredited institutions).

[4] 
The court of appeals stated that “Tyndale has 
steadfastly refused to participate in any of the alternative processes available 
under the statutory oversight plan.” 114 S.W.3d at 630. 
Tyndale has, however, along with seven other 
unaccredited religious schools, endeavored to create its own accrediting agency, 
which the State does not recognize at this time.

[5] 
The Texas Constitution is more explicit in its protection of the freedom to 
worship. “All men have a natural and indefeasible right to worship Almighty God 
according to the dictates of their own consciences.” Tex. Const. art. I, § 
6. The issues are briefed under the U.S. Constitution with reference to 
analogous provisions in the Texas Constitution. The plurality concludes that the 
Texas Constitution is “coextensive” on the issues raised. As neither party 
addresses in substance the application of the Texas Constitution to these issues 
and neither asserts any difference in the jurisprudence between the two 
constitutions, I would “limit our analysis to the First Amendment and simply 
assume that its concerns are congruent with those of [the Texas Constitution].” 
See New Times, Inc. v. Isaacks, 146 S.W.3d 144, 150 (Tex. 2004).

[6] 
The Free Worship Clause of the Texas Constitution provides in its entirety:
 
All men have a natural and indefeasible right to worship 
Almighty God according to the dictates of their own consciences. No man shall be 
compelled to attend, erect or support any place of worship, or to maintain any 
ministry against his consent. No human authority ought, in any case whatever, to 
control or interfere with the rights of conscience in matters of religion, and 
no preference shall ever be given by law to any religious society or mode of 
worship. But it shall be the duty of the Legislature to pass such laws as may be 
necessary to protect equally every religious denomination in the peaceable 
enjoyment of its own mode of public worship.
 
Tex. Const. 
art. I, § 6.

[7] 
The Establishment Clause cases consider whether some form of government aid, 
either direct or indirect, improperly entangles the government in religion. 
Walz v. Tax Comm’n, 397 U.S. 664, 670-75 (1970); see also Church 
of the Lukumi Babalu Aye, 
Inc. v. City of Hialeah, 508 U.S. 520, 532 (1993). In this case, HEB does 
not challenge government aid or support of religion or religious symbols but 
complains of state regulation of its activities. The Supreme Court decided in 
Lukumi that because the dispute raised a 
question of the freedom to worship in the face of governmental regulation, 
rather than governmental efforts to benefit or favor religion, the Free Exercise 
Clause was dispositive. 508 U.S. at 532; 
see also People’s Baptist, 683 S.W.2d at 695.

[8] 
Distinguishing its prior holdings in Free Exercise Clause cases, the Supreme 
Court stated that the “only decisions in which we have held that the First 
Amendment bars application of a neutral, generally applicable law to religiously 
motivated action have involved not the Free Exercise Clause alone, but the Free 
Exercise Clause in conjunction with other constitutional protections, such as 
freedom of speech and of the press.” Smith, 484 
U.S. at 881 (citing, among 
others, Cantwell, 310 U.S. at 304-07; Murdock v. 
Pennsylvania, 319 U.S. 105 (1943); and Wisconsin v. Yoder, 406 U.S. 
205 (1972)). The Court determined that Smith did not present a 
“hybrid rights” case, and therefore did not elaborate on the 
exception.

[9] 
The Southern Baptist Convention’s theological seminary agrees that pursuant to 
its constitutional interest in education, the State may “forbid institutions 
from using the words ‘bachelor’s degree,’ ‘master’s degree,’ etc., unless 
certain defined program requirements are satisfied.” Brief for 
Southwestern Baptist Theological Seminary as Amicus Curiae at 14.
 

[10] The Attorney General’s opinion considered 
the Supreme Court’s free exercise jurisprudence. A Texas statute required 
application of the strict scrutiny test for substantial government burdens on 
religious practices. Tex. Civ. Prac. 
& Rem. Code § 110.001 
et seq. This mimicked the standard required by the Supreme 
Court in Sherbert v. Verner, 374 U.S. 398 (1963). Although I do not think the 
result here would change if the statute applied, the statute is inapplicable as 
its effective date was after the accrual of the cause of action in this case. 
See Tex. Civ. Prac. & Rem. Code § 110.001 et 
seq.

[11] The plurality’s rationale is in tension 
with the Supreme Court’s Smith and Lukumi decisions.

[12] Webster’s Dictionary defines “equivalent as 
similar or alike in significance or import.” Webster’s Third New International 
Dictionary 769 (1961). The Oxford Dictionary defines “equivalent” 
as having equal or corresponding import or meaning. The Oxford Illustrated Dictionary 283 (2nd 
ed. 1975).

[13] We disagree on which constitutional 
provisions are infringed. I would base the decision on commercial speech rights, 
and the plurality would decide this point under the Free Exercise 
Clause.

[14] The Independent Colleges and Universities of Texas, Inc. 
is a nonprofit association of the State’s accredited private colleges and 
universities. It represents the majority of the State’s private undergraduate 
institutions.

[15] If the description indicated that Tyndale’s program in theological studies was certified by 
the State, the speech would be false and subject to legitimate 
regulation.

[16] Some states have adopted this scheme and 
allow unaccredited religious institutions to grant degrees if certain disclosure 
requirements are met. See, e.g., Fla. Stat. § 1005.06(f)(3); Md. Code 
Educ. § 11-202(c)(2).